**ACUSHNET COMPANY, Amtel Incorporated, AVX Corporation, Berkshire Hathaway Inc., Bridgestone/Firestone, Inc., Chamberlain Manufacturing Corp., Commonwealth Electrical Company, Commonwealth Gas Company, Emhart Industries, Inc., Goodyear Tire & Rubber Co., Paramount Communications Incorporated, Teledyne Rodney Metals a Division of Teledyne Industries Incorporated, and United Dominion Industries, Inc., Plaintiffs, Appellants,**

v.

**MOHASCO CORPORATION, Monogram Industries Inc. d/b/a American Flexible Conduit, New England Telephone & Telegraph Company, Nortek, Inc., and Ottaway Newspapers, Inc., Defendants, Appellees.**

No. 97–2138.

United States Court of Appeals, First Circuit.

Heard May 6, 1999.

Decided Sept. 15, 1999.

Stephen J. Brake, with whom David L. Ferrera and Nutter, McClennen & Fish, LLP were on brief, for appellants.

Gerald J. Petros, with whom Charles D. Blackman and Hinckley, Allen & Snyder were on brief, for Monogram Industries and Nortek, Inc., d/b/a American Flexible Conduit, appellees.

George W. House, with whom V. Randall Tinsley and Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. were on brief, for Mohasco Corporation, appellee.

Deming E. Sherman, with whom Edwards & Angell, LLP, were on brief, for Ottaway Newspapers, Inc., appellee.

Seth D. Jaffe, with whom Robert S. Sanoff, Jeffrey L. Roelofs, and Foley, Hoag & Eliot, LLP were on brief, for New England Telephone & Telegraph Company, appellee.

Before BOWNES and CYR, Senior Circuit Judges, and O'TOOLE *, District Judge.

BOWNES, Senior Circuit Judge.

This appeal stems from the contamination and subsequent clean up of an area popularly known as Sullivan's Ledge, located in New Bedford, Massachusetts. Plaintiffs-appellants, collectively known as the Sullivan's Ledge Group, are thirteen corporations which received notices from the U.S. Environmental Protection Agency ("EPA") advising that the government

---

* Of the District of Massachusetts, sitting by designation.

considered them responsible for the pollution of Sullivan's Ledge under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").[1] In the early 1990's, the group entered into consent decrees with EPA in which it agreed to perform remediation at the site.

Invoking § 9613(f) of CERCLA, the Sullivan's Ledge Group thereafter filed the present action in federal court seeking contribution from several parties not targeted by the EPA, including defendants-appellees: Mohasco Corporation; Monogram Industries Inc. and Nortek Inc., doing business as American Flexible Coduit ("AFC"); New England Telephone & Telegraph Company ("NETT"); and Ottaway Newspapers, Inc.[2]

The district court dismissed these contribution claims, granting NETT's motion for summary judgment before trial, and entering judgment as a matter of law for Mohasco, AFC, and Ottaway at the close of plaintiffs' case-in-chief. We affirm, but on somewhat different grounds than the district court. As we understand it, the district court ruled principally that the defendants deposited so little waste at the site that it could not reasonably be said that they caused plaintiffs to incur response costs. To the extent that the court's ruling may be interpreted to incorporate into CERCLA a causation standard

that would require a polluter's waste to meet a minimum quantitative threshold, we disagree. Nevertheless, we conclude that the record was insufficient to permit a meaningful equitable allocation of remediation costs against any of these defendants under § 9613(f).[3]

## I.

Once a pristine and picturesque area well-suited for swimming, hiking, and impromptu gatherings by local residents, over the years Sullivan's Ledge became little more than an industrial dumping ground for scrap rubber, waste oils, gas, combustion ash, and old telephone poles. Sullivan's Ledge was the source of smoke dense enough periodically to obscure the visibility of drivers on nearby roads; residents in the surrounding region commonly blamed the pollution for diminished air quality. The sludge became so toxic, the refuse so thick, and the stench so overwhelming, that city officials closed down the area in the 1970's.

Eventually, the EPA identified a number of business entities, or their successors-in-interest, which it believed were legally responsible for the decades-long pollution at the site. In 1991 and 1992, after lengthy negotiations, members of the Sullivan's Ledge Group entered into two separate consent decrees with the United States. The decrees required

1. The group consists of: Acushnet Co., Amtel Inc., AVX Corp., Berkshire Hathaway Inc., Bridgestone/Firestone Inc., Chamberlain Manufacturing Corp., Commonwealth Electrical Co., Commonwealth Gas Co., Emhart Industries Inc., Goodyear Tire & Rubber Co., Paramount Communications Inc., Teledyne Rodney Metals A Division of Teledyne Industries Inc., and United Dominion Industries, Inc.

2. The complaint also asserted a claim under § 9613(g)(2) for a declaratory judgment that the defendants would be liable for future costs and a claim under § 9607(a) for recovery of the plaintiffs' "costs of response." We need not decide whether, as settling parties subject to a judicially approved consent decree, the plaintiffs may sue under the latter section. Their action is clearly one for contribution,

authorized by § 9613(f)(1), and any other authority for their damages claim is duplicative and unnecessary.

3. 42 U.S.C. § 9613(f) reads in pertinent part:

Any person may seek contribution from any other person who is liable or potentially liable under 9607(a) of this title, during or following any civil action under 9606 of this title or under 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

them to implement a remediation plan and, to some extent, shoulder the costs of restoring the contaminated site to its non-hazardous state, without foreclosing their right to seek contribution from any other responsible parties. They duly commenced clean up efforts in compliance with the consent decrees, and, in turn, brought this contribution action to recover some portion of the realized and anticipated costs.

Plaintiffs accused NETT of dumping the butts of old telephone poles that had been treated with liquid creosote chock-full of Polycyclic Aromatic Hydrocarbons ("PAHs"). They alleged that Nortek and Monogram d/b/a AFC, a manufacturer of conduit and lead-based cable, generated and discarded scrap cable containing lead, copper, and zinc. According to the complaint, New Bedford Rayon, the predecessor-in-interest to Mohasco, deposited waste from the manufacture of rayon filament thread containing, *inter alia,* sodium hydroxide, copper, and sulfuric acid. In rounding out the cast of defendants, plaintiffs alleged that *The New Bedford Standard Times,* the predecessor to Ottaway, generated and disposed of ink sludge bursting with sulfuric acid, nitric acids, and various metals.[4]

In due course, NETT moved for summary judgment. Although NETT conceded for purposes of the motion that it had discarded utility pole butts containing PAHs at the site, NETT argued that its waste added so few PAHs to the mix compared to the overall quantity of PAHs found at Sullivan's Ledge that NETT could not fairly be said to have contributed to the environmental harm or "caused" any of the remediation expenses.

The district court granted the motion during a hearing on June 11, 1996, (followed by a more extensive opinion issued July 24), ruling that NETT had proffered "uncontradicted expert testimony asserting that NETT did not cause, and, in fact, could not have caused the plaintiffs to incur any 'response costs.'" *Acushnet Co. v. Coaters Inc.,* 937 F.Supp. 988, 992 (D.Mass.1996) ("*Acushnet I* "). Specifically, the district court stated that this scientific evidence showed that the creosote-treated pole butts could not have leached PAHs into the soil in an amount greater than pre-existing background PAH levels and that other sources provided the overwhelming proportion of PAH found at Sullivan's Ledge. Because, according to the court, plaintiffs failed to adduce any evidence directly challenging this expert testimony, the court found no triable issue of fact as to causation and entered summary judgment in favor of NETT.

The remaining defendants proceeded to trial. Upon the completion of plaintiffs' case-in-chief, the district court entertained dispositive motions. Mohasco, AFC, and Ottaway moved for judgment as a matter of law, arguing in substance that the environmental harm at Sullivan's Ledge was divisible and that the evidence was insufficient to permit a finding that the material the defendants dumped at the site caused any response costs. Ottaway also argued that plaintiffs had failed to establish that its wastes had actually been transported to Sullivan's Ledge.

Ruling from the bench on December 2, 1996,[5] the court determined that, viewed in the light most favorable to plaintiffs, the case against each of the three defendants suffered "primarily from insufficiency of the evidence." It found that "the evidence the plaintiffs profferred against these three defendants ... is so dramatically below any conceivable appropriate formulation of the [applicable legal] standard, that the outcome of judgment for these

---

4. They also sued several additional parties, including Cornell–Dubilier Electronics, Inc., against whom it obtained a judgment in the amount of 7% of response costs, but those claims are not part of this appeal.

5. The court supplemented its oral ruling with a published opinion on December 17, 1996.

defendants at this time is clear without resolving just where those guidelines will ultimately leave the formulation."

The court explained that, at most, plaintiffs had succeeded in showing that two cubic yards of solid cable waste was attributable to AFC, comprising no more than a fraction of the lead and zinc found at Sullivan's Ledge:

> Looking at AFC as perhaps plaintiffs' best shot among the three, . . . at best, . . . a jury could not find that on an equitable basis, consistent with the Gore factors and with preceden[ts] interpreting the statute, AFC would not be responsible for more than one in 500,-000th—one in 500,000 share, and that that would translate . . . into one hundred dollars. That demonstrates that we're so far below anything that could be classified as an equitable standard of determining shares of legal accountability, that anybody that low, any entity that low, ought to be kept out. . . .

For this reason, it concluded that the evidence at trial against AFC "fails every version one might conceive of an 'equitable factors' test." *Acushnet Co. v. Coaters, Inc.*, 948 F.Supp. 128, 139 (D.Mass.1996) ("*Acushnet II* ").

As for Mohasco, the court found plaintiffs' evidence against Mohasco even weaker than that against AFC. Not only was Mohasco's apparent share of the hazardous waste far smaller than plaintiffs' contribution, plaintiffs' own witnesses conceded that the types of hazardous substances attributable to Mohasco would not "persist in the environment," and "would not have even reached the site because of chemical reactions with other materials." *Id.*

In dismissing Ottaway from the litigation, the court said little other than that the case against Ottaway was "obviously weaker than plaintiffs' case against . . . either of these [other] two defendants."

Lest there be any doubt, the trial judge reiterated that the Sullivan's Ledge Group's claims against these three defendants failed "on two independent grounds": first, the evidence was insufficient to bring AFC, Mohasco, and Ottaway within the group for which "the calculus of appropriate proportional shares" of liability for response costs could be made "and, secondly, on grounds of a lack of showing of causal connection with respect to remediation costs." *See also Acushnet II*, 948 F.Supp. at 139.

The district court entered judgment accordingly. Plaintiffs now appeal from each of the court's rulings.

## II.

CERCLA, as we have said on other occasions, sketches the contours of a strict liability regime. *See, e.g., Millipore Corp. v. Travelers Indem. Corp.*, 115 F.3d 21, 24 (1st Cir.1997). Broad categories of persons are swept within its ambit, including the current owner and operator of a vessel or facility; the owner or operator of a facility at the time hazardous waste was disposed of; any person who arranged for the transportation of hazardous substances for disposal or treatment; and anyone who accepted hazardous waste for transportation. *See* 42 U.S.C. § 9607(a)(1)-(4). There are a few affirmative defenses available, *see* § 9607(b), but they are generally difficult to satisfy (they include showing that the release or threat of release was caused solely by an act of God or an act of war). By and large, a person who falls within one of the four categories defined in § 9607(a) is exposed to CERCLA liability.

While CERCLA casts the widest possible net over responsible parties, there are some limits to its reach. The courts of appeals have generally recognized that "although joint and several liability is commonly imposed in CERCLA cases, it is not mandatory in all such cases." *In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 895 (5th Cir.1993) (discussing import of deletion of joint and several liability language from final version of bill); *see United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 268 (3d Cir.1992) ("*Alcan I* ").

In *O'Neil v. Picillo,* 883 F.2d 176 (1st Cir.1989), we embraced the Restatement (Second) of Torts approach in construing the statute, stating that a defendant may avoid joint and several liability if the defendant demonstrates that the harm is divisible. In that event, damages should be apportioned according to the harm to the environment caused by that particular tortfeasor. *Id.* at 178–79; *accord Dent v. Beazer Materials and Servs.,* 156 F.3d 523, 529 (4th Cir.1998); *United States v. Township of Brighton,* 153 F.3d 307, 317–18 (6th Cir.1998); *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2d Cir.1993) (*"Alcan II "*); *Alcan I,* 964 F.2d at 268–70. *See generally* Restatement (Second) of Torts § 433A (1965).

A responsible party, in turn, may bring an action for contribution under § 9613(f) to recover a portion of costs from "any other person who is liable or potentially liable under § 9607(a)." The standard for contribution liability is the same as that under § 9607(a), *see Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir. 1999), but in resolving contribution claims, a court may, in its discretion, "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." § 9613(f)(1).

A plaintiff seeking contribution must prove that:

1. The defendant must fall within one of four categories of covered persons. 42 U.S.C. § 9607(a).

2. There must have been a "release or threatened release" of a hazardous substance from defendant's facility. 42 U.S.C. § 9607(a)(4); § 9601(14), (22).

3. The release or threatened release must "cause[ ] the incurrence of response costs" by the plaintiff. 42 U.S.C. § 9607(a)(4).

4. The plaintiff's costs must be "necessary costs of response ... consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); § 9601(23)-(25).

*Dedham Water Co. v. Cumberland Farms Dairy,* 889 F.2d 1146, 1150 (1st Cir.1989) (*"Dedham I"*).

Generators whose waste has been deposited in the facility from which there has been a release are presumptively responsible for the response costs, subject to the opportunity to prove (i) that the harm was solely caused by someone (or something) else (*see* § 9607(b)) or (ii) that the harm they caused is divisible (*see O'Neil,* 883 F.2d at 179), and subject further to the equitable allocation of relative shares of responsibility in an action for contribution (*see* § 9613(f)(1)).

The parties do not dispute that Sullivan's Ledge is a "facility" or that each of the defendants was a responsible person within the meaning of § 9607(a). Instead, they hotly contest the correct legal standard by which one could be said to have "caused" plaintiffs to incur remediation expenditures, and whether the record was adequate to allow any meaningful award of response costs.

## III.

The Sullivan's Ledge Group mounts a three-fold attack on the district court's reasoning in resolving the respective motions. Its arguments on appeal are broadbrushed in nature, focusing almost entirely on the legal meaning of "causation" and CERCLA's underlying policy goals. First, plaintiffs insist that reading any causal element into CERCLA is inconsistent with the principle of strict liability. Second, they contend that doing so would run counter to the remedial purpose of CERCLA because, among other things, it will let smaller polluters off the hook and discourage responsible parties from entering into consent agreements with the government. Third, to the extent the district court may have considered equitable factors in ruling in favor of Mohasco, Ottaway, and AFC, plaintiffs claim that the court did so without providing a "full and fair allocation trial" within the meaning of section 9613(f).

Defendants-appellees, for their part, contend that it makes sense to say that a *de minimis* polluter has not caused a responsible party to incur clean up costs; and that, in all events, plaintiffs' contribution claims against them founder for a more fundamental reason: the record did not permit a finding that each should bear a meaningful share of the costs associated with restoring Sullivan's Ledge. In their view, these fatal weaknesses in the plaintiffs' case justified judgment as a matter of law in their favor.

Each of the defendants stands on slightly different terrain, having been dismissed from the action at various stages in the proceedings. We therefore proceed to analyze plaintiffs' arguments within the context of addressing the trial court's disposition of the claims lodged against each defendant.

We affirm the district court's handling of NETT's summary judgment motion, albeit based on a slightly different rationale than the court's own. Although the court initially framed it in terms of causation (erroneously, we believe), a finding of no liability on the part of NETT is nevertheless justified under the principle of equitable allocation under § 9613(f).[6]

■ We have strong reservations about interpreting the statute's causation element to require that a defendant be responsible for a minimum quantity of hazardous waste before liability may be imposed. The text of the statute does not support such a construction—CERCLA itself does not expressly distinguish between releases (or threats of releases) by the quantity of hazardous waste attributable to a particular party. At least on its face, any reasonable danger of release, however insignificant, would seem to give rise to liability. On this point, the courts of appeals are in unison. *See, e.g., A & W Smelter and Refiners, Inc.* v.

*Clinton,* 146 F.3d 1107, 1110 (9th Cir. 1998); *Alcan II,* 990 F.2d at 720; *Alcan I,* 964 F.2d at 260–63; *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 669 (5th Cir. 1990); *see also* 42 U.S.C. § 9601(14) (defining "hazardous substance" without mentioning minimum levels); § 9607(a) (employing broad "any person" language).

To read a quantitative threshold into the language "causes the incurrence of response costs" would cast the plaintiff in the impossible role of tracing chemical waste to particular sources in particular amounts, a task that is often technologically infeasible due to the fluctuating quantity and varied nature of the pollution at a site over the course of many years.

Moreover, it would be extremely difficult, if not impossible, to articulate a workable numerical threshold in defining causation. How low would a polluter's contribution to the mix have to be before a judge could find, with equanimity, that the polluter was not a but-for "cause" of the clean up efforts? Less than 0.5% or 1%? We do not see how such a line, based on the quantity or concentration of the hazardous substance at issue, can be drawn on a principled basis in defining causation. To even begin down that path, we feel, is to invite endless confusion.

Our own decisions provide no basis for such an approach. There is only one case in which we held that clean up efforts were not carried out because of a defendant's dumping: where a water treatment plant had been designed well before its planners acquired knowledge that the defendant might have released hazardous waste into the environment. We found that, to the extent that the plaintiff incurred costs in connection with the planning and design of the treatment facility before it became aware of possible pollution by the defendant, it had not responded to any threat-

---

**6.** NETT further contends that application of CERCLA to its conduct would unconstitutionally impose substantial liability in a retroactive manner and would deprive it of due process of law. Because we uphold the court's decision on other grounds, we need not address these arguments.

ened future releases, but had only spent money to address the actual contamination of the site. Accordingly, we held in *Dedham II* that such expenditures were not "caused" by a threatened release from the defendant's facility. *See* 972 F.2d at 460–61.

That, however, is the only situation in which we have found an insufficient causal nexus between a defendant and the remediation expenditures. And we have never discussed CERCLA causation in quantitative terms. To satisfy the causal element, it is usually enough to show that a defendant was a responsible party within the meaning of 9607(a); that clean up efforts were undertaken because of the presence of one or more hazardous substances identified in CERCLA; and that reasonable costs were expended during the operation.[7] To the extent that the district court held that some minimal quantity of hazardous waste must be involved before a defendant may be held to have "caused" the expenditure of response costs, it was mistaken. *See O'Neil,* 883 F.2d at 179 n. 4 (expressly rejecting, in a related context, the argument that one must demonstrate that defendant was a "substantial" cause of the contamination before CERCLA liability attaches).

This does not mean, however, that the *de minimis* polluter must necessarily be held liable for all response costs. The approach taken by the Second Circuit is instructive. In *Alcan II,* 990 F.2d 711 (2d Cir.1993), the Second Circuit reaffirmed the Restatement (Second) of Torts approach to fleshing out the scope of CERCLA liability, holding that where environmental harms are divisible, a defendant may be held responsible only for his proportional share of the response costs. In

extending the principle a half-step, the Second Circuit went on to say that:

> [A defendant] may escape any liability for response costs if it either succeeds in proving that its [waste], when mixed with other hazardous wastes, did not contribute to the release and cleanup costs that followed, or contributed at most to only a divisible portion of the harm.

*Id.* at 722. The court emphasized that this particular defense was limited to situations where a defendant's "pollutants did not contribute more than background contamination and also cannot concentrate." *Id.* It acknowledged that causation was, in some sense, "being brought back into the case—through the backdoor, after being denied entry at the frontdoor—at the apportionment stage." *Id.* Nevertheless, the court concluded that a defendant who successfully meets its burden can "avoid liability or contribution." *Id.* at 725. The *Alcan II* panel took great pains to leave questions of liability, including the divisibility of environmental harm, and equitable apportionment of clean up expenses, to the sound discretion of the trial judge to be handled in the manner and order he or she deems best. *Id.* at 723. We think the Second Circuit had it right.

■ We therefore hold that a defendant may avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts. This rule is not based on CERCLA's causation requirement, but is logically derived from § 9613(f)'s express authorization that a court take equity into account when fixing

---

7. It might, of course make sense to say that a defendant's release did not "cause" the incurrence of response costs when the monies were expended for purposes wholly unrelated to responding to environmental contamination. And we suppose it may even be accurate to say that a generator or transporter of waste did not cause a plaintiff to incur remediation costs when that person did not actually cause any alleged contamination, *see United States v. Dico, Inc.,* 136 F.3d 572, 578 (8th Cir. 1998), or perhaps even where clean up efforts were directed at cleaning up toxins other than those attributed to the defendant.

each defendant's fair share of response costs.[8] We caution, however, that not every *de minimis* polluter will elude liability in this way. As always, an equitable determination must be justified by the record.

■ There are several reasons why, after all is said and done, an otherwise responsible party may be liable for only a fraction of the total response costs or escape liability altogether. In the first place, § 9613(f) expressly contemplates that courts will take equity into account in resolving contribution claims. We have in the past suggested that while a defendant in a direct EPA enforcement action invoking the divisibility of harm defense bears an "especially heavy burden," a defendant in a contribution proceeding seeking to limit his liability has a "less demanding burden of proof" by virtue of the equitable considerations that come immediately into play. *In re Hemingway Transp., Inc.,* 993 F.2d 915, 921 n. 4 (1st Cir.1993); *see also O'Neil,* 883 F.2d at 183 (stating that a defendant's burden is "reduced" in a contribution action). A court, in evaluating contribution claims under § 9613(f), is "free to allocate responsibility according to any combination of equitable factors it deems appropriate." *O'Neil,* 883 F.2d at 183. *Accord FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 846–47 (10th Cir.1993); *Environmental Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992).

In an appropriate set of circumstances, a tortfeasor's fair share of the response costs may even be zero. *See PMC, Inc. v. Sherwin–Williams Co.,* 151 F.3d 610, 616 (7th Cir.1998) (a party's "spills may have been too inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation would be appropriate") (Posner, J.), *cert. denied,* —— U.S. ——, 119 S.Ct. 871, 142 L.Ed.2d 772 (1999); *O'Neil,* 883 F.2d at 183 (same).

In the second place, there is nothing to suggest that Congress intended to impose far-reaching liability on every party who is responsible for only trace levels of waste. Several courts, albeit taking different paths to a similar result, have rejected the notion that CERCLA liability "attaches upon release of *any* quantity of a hazardous substance." *Licciardi v. Murphy Oil USA,* 111 F.3d 396, 398 (5th Cir.1997) (quoting *Amoco Oil,* 889 F.2d at 670) (emphasis in original);[9] *see e.g., PMC,* 151 F.3d at 616; *Gopher Oil Co. v. Union Oil Co. of Cal.,* 955 F.2d 519, 527 (8th Cir. 1992).

Third, allowing a CERCLA defendant to prevail on issues of fair apportionment, even at the summary judgment stage, is consistent with Congress's intent that joint and several liability not be imposed mechanically in all cases. Permitting a result that is tantamount to a no-liability finding is in keeping with the legislative goal that

8. Because contribution may only be had from a joint tortfeasor, a defendant in a contribution action arguably would have two bites at the apple: he could try to show that (a) the harm is divisible (a function of the causation inquiry) and that he is thus liable only for his share of the damage; and (b) even though he may be a joint tortfeasor, he ought not bear full liability due to one or more equitable reasons. It may or may not make sense to allow a divisibility of harm defense in a § 9613(f) action, *see e.g., Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1513–14 (11th Cir.1996) (holding that divisibility of harm is not available as a defense in contribution actions), even though many of the same considerations would come into play under the rubric of equity. Since the trial court here rendered no definitive findings as

to the divisibility of the environmental damage at Sullivan's Ledge, and because a definitive view on the matter is not required to resolve this appeal, we leave this question for another day.

9. We think, however, that the Fifth Circuit's approach, which demands a finding that defendant's pollution "posed a[] threat to the public or the environment" before it may be said that he has caused plaintiff to incur response costs, goes too far. *Amoco Oil,* 889 F.2d at 670. We concur in the Ninth Circuit's assessment that that interpretation "reads much too much into the word 'causes' in section 9607(a)(4)." *A & W Smelter,* 146 F.3d at 1110.

clean up efforts begin in a speedy fashion and that litigation over the details of actual responsibility follow. In fact, to require an inconsequential polluter to litigate until the bitter end, we believe, would run counter to Congress's mandate that CERCLA actions be resolved as fairly and efficiently as possible. On the whole, the costs and inherent unfairness in saddling a party who has contributed only trace amounts of hazardous waste with joint and several liability for all costs incurred outweigh the public interest in requiring full contribution from *de minimis* polluters.

Plaintiffs complain that any consideration of causation is at odds with CERCLA's objectives and would discourage responsible parties from entering into consent decrees. Because we ground the quantum inquiry solidly in § 9613(f), we are satisfied their prophesy will not come to pass. The ultimate failure of a contribution claim because someone did only a negligible amount of harm does not impede enforcement by the EPA or frustrate any of CERCLA's objectives.

### A.

■ Relying on favorable case law from the Second and Third Circuits, NETT attempted to prove that it contributed only trace amounts of hazardous waste to Sullivan's Ledge. At the summary judgment stage, once a movant has offered evidence showing that there is no dispute as to any material fact and that he is entitled to judgment as a matter of law, the non-moving party must come forward with sufficient evidence to create a triable issue of fact; if he fails to do so, that is the end of the matter. *See* Fed.R.Civ.P. 56.

In its motion for summary judgment, NETT contended that "it is beyond material dispute that no wastes disposed of by [NETT] ..., even when considered with wastes disposed by other persons, could have contributed to the environmental harm at the Site or to the incurrence of response costs" and therefore "such wastes cannot be the basis for the imposition of any liability" upon it. As the moving party, NETT undertook the burden of satisfying the court that its motion ought to be granted.

It offered extensive expert evidence to the effect that the concentration of PAHs from NETT telephone poles, if in fact such poles were left at the site, was negligible. In a series of reports, Dr. John Tewhey estimated that some 335,000 pounds of PAHs were disposed of at Sullivan's Ledge, confirmed that the Sullivan's Ledge Group was responsible for most of this pollution, and stated that PAHs from telephone pole butts could have added no more than negligible amounts to existing PAHs in the surrounding region. He stated that PAH levels in soil samples from areas near where utility poles were located revealed the same amount of PAH found in many popular foods.

We have already rejected the district court's reasoning inasmuch as it may have been rooted in a theory of causation that required some quantitative threshold. But even if NETT may be said to have caused plaintiffs to incur response costs, plaintiffs failed to rebut NETT's evidence showing that it should bear no more than a *de minimis* share of the remediation expenditures under § 9613(f). NETT essentially offered evidence tending to show that its equitable share would amount to zero; plaintiffs gave only a non-responsive rejoinder, mostly by insisting (wrongly) that causation is irrelevant.

Questions of causation and appropriate equitable allocation of response costs involve quintessential issues of fact. *See Dedham II,* 972 F.2d at 457. But we see nothing especially onerous about requiring the Sullivan's Ledge Group to come forward with admissible evidence where a defendant has fairly raised the issues. *See Amoco Oil,* 889 F.2d at 667–68· (approving use of summary judgment to hone trial-worthy issues in multi-defendant CERCLA cases). All that need be done to sur-

vive that stage is to submit admissible evidence sufficient to point up a factual dispute. It is no different than asking a plaintiff to proffer some evidence as to damages where a defendant has claimed in summary judgment papers that the plaintiff has, in fact, suffered no compensable harm. Given the Sullivan's Ledge Group's failure to meet its burden in this regard, the trial court properly entered judgment for NETT.

We turn now to the district court's rulings in favor of AFC, Mohasco, and Ottaway.

**B.**

As a threshold matter, there is some slight confusion as to whether the trial judge's decision for these defendants was based on Rule 50 (judgment as a matter of law) or Rule 52 (findings of fact and conclusions of law after a bench trial). On the one hand, he explicitly stated that he was viewing the evidence in the light most favorable to the plaintiffs, the usual standard for Rule 50 motions; he also impaneled a jury to resolve certain factual matters, raising the added question whether Rule 52 would even be appropriate. *See* Fed.R.Civ.P. 52(a) (applicable to actions "tried upon the facts without a jury or with an advisory jury"). On the other hand, the judge also spoke in terms of making "findings of fact and conclusions of law."

■ Although the court flirted with the prospect of entering judgment by way of Rule 52 (saying, "whichever way I went about it, it would come about the same"), we think it sufficiently clear that the court intended to employ judgment as a matter of law as its principal lens for viewing plaintiffs' claims. *See* App. at 05812 ("I am calling them Rule 50 judgments."). Because we conclude that the trial judge engaged the gears of Rule 50, we scrutinize his legal conclusions *de novo*.[10] Plain-

tiffs' evidence must be viewed in the light most favorable to them, and all reasonable inferences from the record must be drawn to their advantage. *See Koster v. Trans World Airlines, Inc.*, 181 F.3d 24 (1st Cir. 1999).

■ We affirm the judgment on the basis that the evidence was inadequate to permit a rational factfinder to make a quantifiable allocation of response costs to AFC, Mohasco, or Ottaway under § 9613(f). *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 173 (1st Cir. 1998) ("We will affirm a correct result reached by the court below on any independently sufficient ground made manifest by the record.").

While no precise allocations were made in this case, a trial court's perspective is nevertheless instructive as to the equitable considerations most relevant to the dispute at hand. Here, the court found the respective quantities of hazardous materials attributable to each defendant, the toxicity of the respective wastes, and their durability to be highly relevant to fixing an equitable share. Within this general framework, the court assessed the Sullivan's Ledge Group's evidence and found it inadequate. We agree.

Plaintiffs' evidence at trial tended to show that AFC was responsible for hazardous waste at Sullivan's Ledge on a scale "thousands of times less than the remaining contribution of others"; that, in terms of sheer mass, the two cubic yards of solid waste attributable to AFC constituted an insignificant amount of pollution when compared to over one million cubic yards of waste found at Sullivan's Ledge; that the remediation plan was largely driven by the presence of hazardous substances other than copper and zinc; and that the materials attributable to AFC was not as toxic as the other substances discov-

---

10. Had the district judge made actual allocations under § 9613(f), his equitable determinations would not be overturned unless he abused his discretion in some fashion, and

any underlying findings of fact would be subject to clear error. *See Dedham II*, 972 F.2d at 457.

ered at the site, namely, PAHs, Volatile Organic Compounds, and Polychlorinated Biphenyls. Taking at face value plaintiffs' own estimates of the costs of remediation, AFC's share of response costs, in the most generous formulation, would amount to no more than 1/500,000 of $50 million amounting to less than $100.

Two main factors underlay the trial court's ruling in favor of Mohasco: (1) Plaintiffs' evidence against Mohasco was far weaker than that against AFC; and (2) undisputed scientific testimony by plaintiffs' own experts that hazardous substances attributed to Mohasco "would not persist in the environment."

As for Ottaway, beyond the small amount of material attributable to its predecessor-in-interest, *The New Bedford Standard Times*, plaintiffs' evidence actually linking *The New Bedford Standard Times* to the ink waste at Sullivan's Ledge was thin at best.

On appeal, plaintiffs make no real effort to challenge the court's characterization of their evidence or of each defendant's apparent equitable share of the clean up expenditures. Eschewing a direct attack on the factual bases for the court's ruling, they instead make a series of arguments aimed at the court's legal reasoning and the general format of the proceedings.

They first suggest that equitable determinations played no role in the court's decision and therefore provide an inadequate ground for affirmance.[11] Even a cursory examination of the record puts this argument to rest. The court repeatedly referred to the equitable factors it found most salient, and discussed the weight of the evidence as to each of these factors. While the judge was not making specific allocations, it is plain to us he was holding that, in light of the equitable factors he would apply should he make explicit findings, plaintiffs' evidence showed too little pollution to justify compelling defendants to take on any meaningful share of the response costs. We read him to say that if he had to make an allocation for AFC, Mohasco, and Ottaway, the evidence dictated that each of their shares for response costs would be zero. The court's reasoning is therefore sufficiently transparent as to provide a basis for affirmance. We add that, even if the trial court's explanations were less than lucid (which they are not), we would still have the power to affirm on any ground apparent on the face of the record. *See Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991) ("An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground.").

Plaintiffs next argue that the trial court erroneously presumed them liable for response costs in violation of 42 U.S.C. § 9622(d)(1)(B) (providing that execution of consent decree in connection with CERCLA enforcement "shall not be considered an admission of liability"). This, they argue, improperly imposed on plaintiffs a burden they should not have been required to bear, namely, that of proving their own non-liability. This argument, too, is easily rejected. The judge made it perfectly clear that all of the parties were starting "on equal ground," that he "was not assuming that anybody has any special burdens in this case," and that he was "not drawing [an adverse] inference" from the consent decrees. Although the court did mention the "fundamental principle" that injuries be left where they lie unless judicial intervention is warranted, that is simply another way of saying that plaintiffs at all times had the burden of proving their contribution claims.

■■■ There is one final matter to be untangled. The Sullivan's Ledge Group suggests that insofar as the trial judge purported to make equitable findings un-

---

**11.** This reason comes in response to defendants' argument on appeal that the trial judge's view as to the equitable factors involved constituted findings of fact, and, consequently, that they provide an alternative basis for affirmance.

der § 9613(f), it did so prematurely. Plaintiffs insist that a remand is warranted so that a full and fair hearing may be held before the court can accurately allocate the response costs among each of the liable parties.

We are aware that a specific allocation cannot logically be made until a defendant has been deemed liable as a responsible party, for contribution may only be obtained from joint tortfeasors. Nevertheless, we are mindful of the complex nature of these kinds of lawsuits. District courts have considerable latitude to deal with issues of liability and apportionment in the order they see fit to bring the proceedings to a just and speedy conclusion. *See Alcan II,* 990 F.2d at 723. CERCLA does not demand a bifurcated trial on this score, nor have we insisted that the many knotty issues that arise in the typical CERCLA action be resolved in any particular chronological order.

On this record, we find no abuse of discretion in the court's failure to make more detailed findings or to hold a separate allocation hearing. Nothing in the record suggests that plaintiffs complained about the unified nature of the § 9613(f) proceedings. If plaintiffs felt truly hampered by the structure of the trial, they should have interposed a timely objection. We also think it telling that they make no effort to describe the additional material it would present to the trial judge were we to order a remand. We will not order a remand when it is likely to be an empty exercise. Finally, the fact that the court received the Sullivan's Ledge Group's evidence over the course of seventeen days convinces us that plaintiffs had every opportunity to submit any and all relevant evidence at its disposal on the issues of liability and equitable apportionment.

*Affirmed. Costs awarded to defendants-appellees.*