[No. 24042-4-II.    Division Two.    December 3, 1999.]
SEATTLE CITY LIGHT, ET AL., *Respondents*, v. THE
DEPARTMENT OF TRANSPORTATION, *Appellant*.

*Christine O. Gregoire, Attorney General*, and *Deborah L. Cade, Assistant*, for appellant.

*Robin Jenkinson, Tacoma City Attorney*, and *George Stephen Karavitis, Assistant*; *Mark H. Sidran, Seattle City Attorney*, and *Peter Edward Hapke, Assistant*; *Joel Cartwright Merkel*; *Erik K. Wahlquist* of *Davis Arneil Law Firm*; *Shannon M. Murphy* of *Dudenbostel Law Offices*; *Dennis R. Colwell* of *Ingram, Zelasko & Goodwin*; and *William Henry Beaver, Jr.* of *Karr Tuttle Campbell*, for respondents.

BRIDGEWATER, C.J. — Seven public utilities sued the Washington State Department of Transportation (WSDOT) under the Washington Model Toxics Control Act (MTCA) for contribution to recover remedial action costs associated with cleaning up a Superfund site. WSDOT appeals the trial court's decision that it was liable and had to pay the Utilities 1.8 percent of the total site cleanup costs, some attorney fees, expenses and other costs. We affirm the trial court's holding that WSDOT is technically liable under the MTCA, but reverse the court's holding that WSDOT pay remedial action costs to the Utilities. Because the asphalt that WSDOT contributed to the site did not pose a threat or potential threat to human health or the environment, we hold that the trial court erred in requiring WSDOT to pay for costs associated with the cleanup of PCBs that another party later poured on the asphalt. Consequently, we reverse the award for remedial action costs, attorney fees and costs and order summary judgment in favor of WSDOT.

A group of public utilities from Seattle, Tacoma, and five other areas (collectively the Utilities), sent their used

transformers to Leonard Strandley's transformer disposal business in Purdy, Washington. In the summer of 1984, the U.S. Environmental Protection Agency (EPA) shut down Strandley's operation after finding that PCB (polychlorinated biphenyl) and dioxin contamination from the site threatened a nearby lagoon. Accepting their own clear liability, the Utilities formed a voluntary group to clean up the site. EPA supervised the cleanup.

Part of the site cleanup included disposing of a large railroad tank car that Strandley used in his operation. The tank was 28 feet long and 7 feet in diameter, weighed about 11,000 pounds and held about 9,000 gallons. Strandley used the tank to store PCB-contaminated transformer oil that he drained from the Utilities' transformers. He would then sell the oil to recyclers. During the cleanup, the Utilities discovered a semi-hardened, asphalt layer on the bottom of the tank that had become contaminated with PCBs. The Utilities tested the asphalt but did not find the presence of any other toxic chemicals apart from PCBs. No evidence suggests that the PCBs and asphalt combined and commingled synergistically to form a new and different hazardous substance.

The Utilities discovered that WSDOT originally owned the tank car, using it to store an asphalt emulsion known as "tack oil," a substance that serves as a kind of asphalt glue to bond new asphalt pavement to old. In 1975, WSDOT requested authority to sell the storage tank as scrap metal, stating that the tank was "rusted and in such condition no longer serviceable to the Department." Gordon Manning purchased the tank for $236 and a few years later sold it to Strandley, Manning's brother-in-law. When WSDOT sold the tank car to Manning, the tank contained the hardened layer of asphalt emulsion.

No evidence suggests that the tank ever leaked or that WSDOT ever added PCBs to it. Asphalt, by itself, is a petroleum-based product. The parties agree that hardened asphalt does not pose a threat to human health or the environment.

The Utilities sued WSDOT for contribution under the MTCA, claiming that WSDOT had disposed of a hazardous substance and should be held responsible for some of the cleanup costs.

The trial court bifurcated the action, first deciding on cross-motions for summary judgment that WSDOT was liable under the MTCA. In the cost allocation phase of the proceedings, also tried by affidavit, the Utilities claimed that the quantity and consistency of the asphalt doubled the cost of cleaning up the PCBs in the tank and, consequently, requested half the total cost of the tank cleanup. The Utilities also requested some costs related to cleaning up the "toxic hot spot" on the ground around the tank where Strandley had spilled transformer oil. The total cost of remedial action at the Strandley–Manning site was about $10 million. The trial court granted judgment in the amount requested by the Utilities: $180,037.29 of the cleanup costs, $24,143.91 in attorney fees and expenses relating to the remedial action, and another $64,845.04 in attorney fees and costs as the prevailing party. Thus, the total award against WSDOT was $269,026.24.

## I. Review Standards

The parties cross-moved for summary judgment on the issue of liability. This court reviews summary judgment under the familiar standards, namely, a de novo application of CR 56(c). *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We do not reach the issue of the standard used in reviewing the actual allocation of remedial action costs because we hold the court should have granted summary judgment in favor of WSDOT under CR 56.

## II. MTCA Contribution Action

In 1989, Washington voters approved the MTCA, which has the ambitious goal of cleaning up contaminated land and preserving the environment for future generations. Some parts of the MTCA track its federal counter-

part CERCLA[1] and, consequently, federal cases interpreting similar language in CERCLA are persuasive, albeit not controlling, authority.[2] But unlike CERCLA, Washington's MTCA explicitly creates a scheme of strict liability and joint and several liability for those caught in its sweep.[3]

The Utilities, responsible for cleanup costs at the Strandley–Manning site, brought a private contribution action against WSDOT to recover some of those costs. Like the trial court, we must address two questions. First, is WSDOT liable under RCW 70.105D.040? If the answer is yes, then what portion of the cleanup costs should be allocated to WSDOT? The first question is determined by applying the statutory criteria (enumerated in RCW 70.105D.040) to the facts. We hold that there is liability under the Act. But in order to impose remedial costs for cleanup on a defendant, a plaintiff must prove that the hazardous substance poses a threat or potential threat to human health or the environment. RCW 70.105D.020(21).[4] Then, "[r]ecovery shall be based on such equitable factors as the court determines are appropriate." RCW 70.105D.080.

## A. Liability

WSDOT is liable for remedial action costs if it is an "arranger" who disposed of a "hazardous substance" under the Act. Liability is defined, as relevant here, as follows:

> (1) Except as provided in subsection (3) of this section [defenses], the following persons are liable with respect to a facility:

---

[1]The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 and its 1986 reenactment, the Superfund Amendments and Reauthorization Act of 1986 (SARA).

[2]*Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 427, 833 P.2d 375 (1992).

[3]The Act expressly provides in part: "(2) Each person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." RCW 70.105D.040.

[4]Although the Act has been amended several times, we cite to the current sections, because the sections relevant here have not been substantially modified since this action was filed.

(a) The owner or operator of the facility;

(b) Any person who owned or operated the facility at the time of disposal or release of the hazardous substances;

(c) Any person who owned or possessed a hazardous substance and who by contract, agreement, or otherwise arranged for disposal or treatment of the hazardous substance at the facility, or arranged with a transporter for transport for disposal or treatment of the hazardous substances at the facility, or otherwise generated hazardous wastes disposed of or treated at the facility;

RCW 70.105D.040.

We segregate the contested elements of liability from the uncontested. The parties agree on several elements: WSDOT is a "person" as defined by MTCA; WSDOT owned the tank car and the asphalt emulsion in the tank car before they were sold to Manning in 1975; and the site was a "facility" under the Act. WSDOT contests only two elements of liability: that the asphalt emulsion in the tank car was a "hazardous substance"; and that WSDOT arranged for its disposal.

### 1. Hazardous Substance

"Hazardous substance" as defined by the Act expressly includes: "(d) Petroleum or petroleum products." RCW 70.105D.020(7). The Act's "petroleum product" definition contains one exception:

The term hazardous substance does not include any of the following when contained in an underground storage tank from which there is not a release: Crude oil or any fraction thereof or petroleum, if the tank is in compliance with all applicable federal, state, and local law.

RCW 70.105D.020(7)(e). This exception does not apply to

the facts here, and there are no other exceptions from the terms "petroleum or petroleum products."[5]

■ WSDOT concedes that the asphalt residue in the tank car is a petroleum product. But WSDOT argues that it has no liability because asphalt is ubiquitous and benign, and the City is unable to prove that the asphalt residue, itself, created a threat or a potential threat to public health or the environment. While the degree of the hazard may be relevant to the question of cost allocation (see below), it is irrelevant to liability.

Petroleum products are specifically enumerated "hazardous substances" under the Act. Like CERCLA, no minimum level of "hazardous substance" is required to trigger MTCA liability. *See A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110-11 (9th Cir. 1998) (rejecting de minimus defense); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 260-63 (3d Cir. 1992). Consequently, the trial court was correct in concluding that the asphalt residue in the tank car was a "hazardous substance" under the MTCA.

## 2. "Arrange" For "Disposal"

WSDOT arranged for the disposal of a hazardous substance when it sold the tank car to Manning as scrap. The MTCA does not define the term "arranger," but CERCLA contains the same term and federal courts have interpreted the term broadly, concluding that "a liberal judicial interpretation is consistent with CERCLA's 'overwhelmingly remedial' statutory scheme." *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1380 (8th Cir. 1989) (citation omitted). Thus, "[i]t is possible to 'arrange for' disposal

---

[5]"The canon of construction that says 'expressio unius est exclusio alterius' cautions against creating additional exceptions to complex statutory enactments." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 517 (2d Cir. 1996) (reversing summary judgment premised on "non-releasability" and "de minimus" defenses to CERCLA liability), *cert. denied sub nom., Zollo Drum Co. v. B.F. Goodrich Co.*, 524 U.S. 926, 118 S. Ct. 2318, 141 L. Ed. 2d 694 (1998).

without knowing what will happen to the stuff, or even while hoping that it ends up in the best of all possible spots, or while insisting that proper practices be rigorously followed." 4 WILLIAM H. RODGERS, JR., ENVIRONMENTAL LAW: HAZARDOUS WASTES AND SUBSTANCES § 8.12C, at 678 (1992) (footnotes omitted). Liability has been imposed on defendants who sought to characterize their arrangement with another party who disposed of their hazardous substances as a "sale" rather than a "disposal." *Aceto*, 872 F.2d at 1381 (citing *New York v. General Elec. Co.*, 592 F. Supp. 291, 297 (N.D.N.Y. 1984)).

But in limited circumstances, federal courts have recognized a "useful product" defense to arranger liability:

> [W]here the transaction involved a sale, courts have asked whether there was a transfer of a "useful" or "waste" product. In several cases, courts have considered whether the defendant intended to dispose of a substance at the time of a transaction. Courts have also looked to whether a defendant made the "crucial decision" to place hazardous substances in the hands of a particular facility.

*South Fla. Water Management Dist. v. Montalvo*, 84 F.3d 402, 406-07 (11th Cir. 1996) (citations omitted). No single factor controls, and each case presents fact-driven analysis. Thus, we must inquire whether WSDOT's sale of the tank car containing the hazardous substance was in fact an arrangement for disposal or was a sale of a useful item.

■ The trial court correctly reasoned that the MTCA does not require a plaintiff to prove that the defendant had the specific intent to dispose of a hazardous substance:

> Because the MTCA is a strict liability law, it would be incongruous to allow a defendant to escape liability by showing that it did not intend to dispose of a hazardous substance. Such reasoning applied to a case such as this would discourage companies from carefully tracking their hazardous substances, contrary to the intent and purpose of the MTCA. *See* RCW 70.105D.010(2).

We adopt the trial court's reasoning on this point.

■ The trial court also concluded that when WSDOT sold the tank car as scrap, it was disposing of the tank car and its contents:

> [WSDOT] admits that it no longer had a use for the tank car when it was sold to Mr. Manning. The purchase requisition indicates that the tank car was rusted and nonserviceable and requested permission to sell it as scrap. That Mr. Strandley later used the tank car to store hazardous substances does not change WSDOT's intent to dispose of the tank car. Further, it would not be consistent with the wide net of liability cast by CERCLA and the MTCA to allow a defendant to escape liability for the contents of a tank or other container simply by selling that container to another who also uses it to store hazardous substances.

Again, we adopt the trial court's reasoning. Companies would have little incentive to dispose of their waste properly if they could avoid MTCA liability by simply selling any container filled with hazardous substances at nominal cost, since a container usually has some marginal utility to someone.[6]

Even though the asphalt substance was contained within the tank and apparently never came in contact with the ground, the asphalt was considered "released" under the MTCA. The term "release" includes "the abandonment or disposal of containers of hazardous substances." RCW 70.105D.020(20).

Accordingly, we hold that when WSDOT sold the tank car as scrap, it arranged for the disposal of the tank car and its contents. The asphalt emulsion in the tank was a hazardous substance under the MTCA. Thus, WSDOT is liable under RCW 70.105D.040.

### B. Contribution

Washington's MTCA now explicitly provides for a private

---

[6]Usually, selling an item for scrap triggers arranger liability if hazardous substances are present. *See, e.g., United States v. Summit Equip. & Supplies, Inc.,* 805 F. Supp. 1422, 1432 (N.D. Ohio 1992).

right of action for contribution from another polluter. "[A] person may bring a private right of action, including a claim for contribution or for declaratory relief, against any other person liable under RCW 70.105D.040 for the recovery of *remedial action costs.*" RCW 70.105D.080 (emphasis added).[7] The term "remedial action" means

> any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize *any threat or potential threat posed by hazardous substances to human health or the environment* including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance and any health assessments or health effects studies conducted in order to determine the risk or potential risk to human health.

RCW 70.105D.020(21) (emphasis added).

■ The party seeking contribution bears the burden of establishing its entitlement to contribution. *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 763 n.2 (7th Cir. 1994). A liable party "may be required to pay complete response costs, or may not be required to pay any response costs, or may be required to pay some intermediate amount," depending on the court's equitable assessments. *Akzo Coatings, Inc. v. Aigner Corp.*, 909 F. Supp. 1154 (N.D. Ind. 1995) (interpreting interplay between CERCLA sections addressing liability for cleanup and contribution). While the quantity and relative toxicity of a hazardous substance is irrelevant to liability, such considerations are relevant to allocating costs.[8] In many cases (if not most), it is extremely

---

[7]The statute proscribes some limitations on a party's ability to bring a contribution action but none are issues in this appeal. (*See* limitations contained in RCW 70.105D.080, including: no right of contribution from settling parties or, in circumstances, successors in interest to settling party; requirement that cleanup be substantially equivalent to a department-conducted or department-supervised cleanup; and time limitations).

[8]In weighing equitable factors, federal courts usually address the "Gore" factors, which are:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the haz-

difficult to dissect the waste and associated cleanup costs.[9] But that does not appear to be the case here.

WSDOT concedes that the asphalt in the tank had to be cleaned up after it was contaminated with PCBs. But WSDOT argues that it should not be responsible for the cost of cleaning up PCBs because the asphalt that it contributed to the site did not pose a threat to human health or the environment. We agree and hold that before a court may equitably allocate remedial action costs in a contribution action, the party seeking contribution under RCW 70.105D-.080 must demonstrate that the defendant's hazardous substance contributed to a threat or potential threat to human health or the environment. RCW 70.105D.040, .020. In this case, WSDOT's hardened asphalt did not contribute to a threat or potential threat to human health or the environment.

If the tank had been partially filled with a nonhazardous substance (e.g., sand), the Utilities' cleanup might have been as difficult as one involving asphalt, but there would have been no basis for an action to recover against WSDOT. If no PCBs had ever been introduced into the tank, and the tank had remained on the site, EPA would not have ordered the cleanup of the tank and an action for remedial costs would not have been appropriate. But the Utilities contend that merely because a hazardous substance was present, WSDOT must contribute to the remedial action costs. The Utilities assert that it is irrelevant how the asphalt got contaminated so long as it was a haz-

ardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned . . . ; and (6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Dash Point Village Assoc. v. Exxon Corp.*, 86 Wn. App. 596, 608 n.24, 937 P.2d 1148, 971 P.2d 57 (1997) (citation omitted).

[9]A host of dumpers may release a myriad of toxic substances that commingle and react in unknowable ways. Cases are often settled at the cost allocation stage based on "rough justice" divisions, including apportioning responsibility based on the volume of materials dumped. *See* 4 RODGERS, § 8.13B.

ardous substance when it appeared on the site. The position is illogical. We find several uncontested facts salient in considering whether remedial action costs were expended to clean up the asphalt:

(1) The parties agree that hardened asphalt, by itself, does not pose a threat or potential threat to human health or the environment;

(2) Waste asphalt is disposed of as construction/demolition debris at local landfills;

(3) No hazardous substances were found in the solidified asphalt emulsion in the tank other than PCBs and its associated contaminants;

(4) There was no synergistic effect from combining PCBs and asphalt;

(5) The tank did not leak;

(6) Remedial action was necessitated only by the presence of PCBs in the asphalt;

(7) WSDOT did not use PCB-contaminated asphalt;

(8) WSDOT did not contribute any PCB contamination to the site;

(9) The PCB oil found in the storage tank was placed there solely by the site operator, and was obtained from the transformers that were sent by the Utilities; and;

(10) WSDOT never had any control or possession of the PCBs.

Accordingly, we conclude that WSDOT is not responsible for any portion of the cleanup costs associated with disposing of the PCB-contaminated asphalt at the site, because the asphalt did not pose a threat to human health or the environment. Therefore, it was not a remedial action cost under RCW 70.105D.020(21). Our conclusion is consistent with the objectives of the MTCA. As the First Circuit recently noted: "[t]he ultimate failure of a contribution claim because someone did only a negligible amount of harm does not impede enforcement by the EPA or frustrate

any of CERCLA's objectives." *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 79 (1st Cir. 1999) (holding that there is no minimum quantitative threshold for CERCLA liability, but affirming the trial court's dismissal of de minimus polluters where, at best, one defendant was responsible for 1/500,000 of volume toxic chemicals found at site).

■ As an alternative basis for our holding, we also follow the reasoning of *Acushnet*. If WSDOT contributed minimally to the Utilities' remedial actions costs, WSDOT may nevertheless avoid liability in a contribution action, "if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts." *Acushnet*, 191 F.3d at 77. WSDOT met this burden.

There are no disputed issues of fact regarding the asphalt in the tank. The asphalt emulsion did not pose a threat to human health or the environment and, therefore, the disposal of the asphalt does not come within the statute as a remedial action cost recoverable by the Utilities.[10] Summary judgment should have been granted in favor of WSDOT. All attorney fees and costs are therefore ordered reversed and stricken.

Affirmed as to the order granting summary judgment to the Utilities on the issue of MTCA liability; reversed as to the order awarding remedial action costs to Utilities; and remanded for the entry of summary judgment in favor of WSDOT.

ARMSTRONG and HUNT, JJ., concur.

---

[10] We do not decide what costs should be allocated where there is either a synergistic effect between hazardous substances at a site or where multiple de minimus polluters contribute to a toxic "soup" that is, in the aggregate, harmful to the human health or the environment.