COOPER INDUSTRIES, INC.; Keystone Consolidated Industries, Inc.; The Monarch Machine Tool Co.; Niagara Mohawk Power Corporation; Overhead Door Corporation, Plaintiffs,

v.

AGWAY, INC.; BMC Industries, Inc.; Borg–Warner Corporation; Elf Atochem North America, Inc.; Mack Trucks, Inc.; Motor Transportation Services, Inc.; Pall Trinity Micro Corporation; The Raymond Corporation; Redding–Hunter, Inc.; Rotelcom, Inc.; Smith Corona Corporation; Sola Basic Industries, Inc.; Wilson Sporting Goods, Inc.; Philip A. Rosen; Harvey M. Rosen; City of Cortland; and New York State Electric and Gas Corporation, Defendants.

No. 92–CV–0748.

United States District Court, N.D. New York.

Feb. 27, 1997.

O'Connor, Gacioch & Pope, Binghamton, NY, for plaintiffs; Thomas F. O'Connor, Alan J. Pope, of counsel.

Weinberg, Bergeson & Neuman, Washington, D.C., for defendant Pall Trinity Micro; Reed W. Neuman, of counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

The motion before the Court is brought by the above-referenced plaintiffs seeking summary judgment on the issue of liability as against the defendant Pall Trinity Micro Corporation ("PTM") for response costs at the so-called Rosen superfund site. The defendant opposes the motion and has cross-moved for summary judgment in its favor.

This case is brought under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9657. The facts of this case are well-known to the parties and the Court, and are set forth in the relevant sections of the decision of the Court below.

By way of an overview, the Court notes that the plaintiffs have and are currently paying the costs of removal and the costs of the remedial investigation at the Rosen Superfund Site, pursuant to a number of Administrative Orders on Consent issued by the EPA. The costs to date exceed $1.9 million.

In brief, the plaintiffs allege that PTM arranged for the removal of certain scrap metal and liquid waste from its facility directly and indirectly through Rosen Brothers. This relationship allegedly occurred intermittently during the nineteen seventies. The plaintiffs further allege that the Rosen Brothers dumped some or all of the waste removed from PTM at their "yard," the so-called Rosen Site. Finally, the plaintiffs allege that the waste from PTM that was dumped at the Rosen Site caused the incurrence of a portion of the response costs associated with the Rosen Site cleanup. On this basis the plaintiffs seek an order imposing CERCLA liability against the defendant PTM.

Briefly stated, in reply, the defendant argues that there is proof that PTM had a relationship with the Rosen Brothers for only six months in the early seventies. Moreover, the defendant alleges that at best small amounts of scrap metal were dumped at the Rosen Site. Finally, the defendant alleges that these small amounts of scrap metal could have contributed no more than back-

ground levels to the Rosen Site environment. On this basis generally, the defendant argues that it should not be held liable for any response costs incurred in connection with the Rosen Site.

To establish liability under CERCLA, the plaintiffs must show that PTM is a responsible party as defined under CERCLA, that the Rosen site is a "facility" within the meaning of CERCLA, that hazardous substances were released at the Rosen site, that the plaintiffs have incurred response costs due to the release of hazardous substances at the Rosen site, and that the response costs are consistent with the National Contingency Plan. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992).

Pursuant to a Memorandum–Decision and Order of this Court, dated August 25, 1995, it is established that: (1) the plaintiffs have incurred response costs due to the release of hazardous substances at the Rosen site; (2) the response costs are consistent with the National Contingency Plan; (3) the Rosen site is a "facility" within the meaning of CERCLA; and (4) hazardous substances were released at the Rosen site. Thus, the remaining issue to be determined with respect to PTM is whether it is a "responsible party."

The plaintiffs have moved for summary judgment on the basis that the evidence conclusively shows (1) that PTM arranged for the disposal of its waste by the Rosen Brothers, the owners of the Rosen site, (2) that PTM waste actually was disposed of at the Rosen site, (3) that PTM's waste contained CERCLA hazardous substances, and (4) that hazardous substances of the kind found in PTM's waste were found at the site.

PTM responds by arguing that it, rather than the plaintiffs is entitled to summary judgment. The first arguments do not deal with the merits of a CERCLA claim. Rather, the defendant argues that the plaintiffs have failed to plead a claim for which relief can be granted, that CERCLA cannot be applied retroactively, and that CERCLA, as applied in this case, violates the Commerce Clause of the United States Constitution. Then, the defendant turns to the merits of the CERCLA claim allegedly asserted

against it. PTM argues that the plaintiff's expert affidavit must be excluded, that the affidavits and testimony relied on by the plaintiffs is inadmissible on summary judgment, that the entire argument relied on by the plaintiffs is based on impermissible inferences, and that, with respect to manganese and copper from scrap metal at the Rosen site, PTM's divisible share is zero.

The Court will address each of these arguments *seriatim.*

## II. DISCUSSION

### A. Motion to Dismiss for Failure to State a Claim, CERCLA Retroactivity, and CERCLA in Relation to the Commerce Clause

These issues were raised before the Court in the summary judgment motions relating to the defendant Mack Trucks, Inc. The Court subsequently heard oral argument and rendered a written decision. *See Cooper v. Agway,* 1996 WL 550128 (Sept. 23, 1996). The Court held that the plaintiffs' Complaint was viable, that CERCLA applied retroactively, and that CERCLA did not violate the Commerce Clause.

"The law of the case doctrine 'posits that when a Court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *DiLaura v. Power Authority of N.Y.,* 982 F.2d 73, 76 (2d Cir.1992), *quoting Liona Corp. v. PCH Assocs. (In Re PCH Assocs.),* 949 F.2d 585, 592 (2d Cir.1991) (further citation omitted). As the issues listed above have previously been decided by this Court, they constitute the law of the case, and will not be revisited herein. The defendant PTM is referred to the Court's reasoning in its September 23, 1996 Memorandum–Decision and Order for an extended discussion of these issues.

The defendant PTM's motion to dismiss the Complaint on the aforementioned grounds is denied.

### B. Standard For Summary Judgment

The standard for analyzing a summary judgment motion is well-settled. A motion

for summary judgment should be granted "if the pleadings ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial burden of showing the Court that, on the evidence before it, there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact has been raised, not only must there be no genuine issue as to the evidentiary facts, but there also must be no controversy regarding the inferences to be drawn from them. *Bennett v. New York City Dept. of Corrections,* 705 F.Supp. 979, 982 (S.D.N.Y. 1989).

Once the moving party has satisfied its burden, the nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When "considering a motion for summary judgment, the district court may rely on 'any material that would be admissible or usable at trial.'" *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 516 (2d Cir.1994), *quoting* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 2721 at 40 (2d ed. 1983)). All ambiguities must be weighed in favor of the non-moving party. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). With these standards in mind, the Court now turns to the issues presented.

**B. CERCLA Liability**

As an initial matter, the defendant strenuously argues that the Court should not consider the affidavit of the plaintiffs' expert, Roy O. Ball. It is the defendant's contention that Mr. Ball's opinions are based on unsupportable inferences. In reply, the plaintiffs sufficiently rebut the defendant's contentions, such that the Court has considered the Ball Affidavit in connection with the present motions.

Liability under CERCLA is imposed where a plaintiff establishes the following five elements: (1) the defendant falls within one of the four categories of "responsible parties" enumerated in § 107(a), 42 U.S.C. § 9607(a); (2) the site of the clean-up is a facility under § 101(9), 42 U.S.C. § 9601(9); (3) there is a release or threatened release of hazardous substances at the facility; (4) as a result of which plaintiff has incurred response costs; and (5) the costs incurred conform to the national contingency plan ("NCP") under § 107(a)(4) as administered by the EPA. *See U.S. v. Alcan Aluminum Corp.,* 990 F.2d 711, 719–20 (2d Cir.1993), *citing B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992). "If the [plaintiffs] establish[ ] each of these elements on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b), then [the plaintiffs are] entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages." *U.S. v. Alcan Aluminum Corp., supra,* at 720, *citing Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989).

CERCLA is a strict liability statute, and imposes liability "any person who by contract, agreement, or otherwise arranged for disposal or treatment" of hazardous substances "from which there is a release, or a threatened release which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(3) and (4). As explained by the Second Circuit, "[t]he plain meaning of this language dictates that [a plaintiff] need only prove: (1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) that the defendant generated hazardous waste at the clean-up site. What is not required is that [a plaintiff] show that a specific defendant's waste *caused* incurrence of clean-up costs." *Alcan,* 990 F.2d at 721 (emphasis added).

As to what constitutes a hazardous substance, CERCLA defines the term by cross-referencing several other environmental stat-

utes.[1] *See* 42 U.S.C. § 9601(14). Significantly, the Act expressly refers to *any* such substance, and imposes no quantitative requirement. 990 F.2d at 720.

The Court need not discuss each element of CERCLA liability at this time. It has already been determined by this Court that: (1) there was a release of hazardous substances at the Rosen site; (2) that the Rosen site is a "facility" within the meaning of CERCLA; (3) that the plaintiffs have incurred response costs due to the release of hazardous substances at the Rosen site; and (4) that the response costs incurred by the plaintiffs are consistent with the National Contingency Plan. *See* August 25, 1995 Memorandum–Decision and Order of this Court. Accordingly, the Court, for the purposes of deciding the present summary judgment motions, must consider whether the record raises a material factual issue as to whether the defendant PTM is a responsible party.

**D. Responsible Party**

There are really two issues for the Court to examine: first, whether PTM is a responsible party, and second, to what extent PTM is responsible, if at all.

Pursuant to the express language of the statute, "responsible parties," in relevant part, include:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances

42 U.S.C. § 9607(a)(3). Therefore, to meet their burden, the plaintiffs in this case must show that the defendant arranged in some manner to have its waste transported to the Rosen site, that such waste was transported to the site, that the waste contained hazardous substances, and that those same substances were found at the site.

There are two basic categories of waste material at issue in this case with respect to PTM: (1) scrap metal, which includes metal turnings or scrapings, carbon steel separator sheets, and steel and copper wire scrap, and (2) liquid wastes, such as waste solvents and cutting oils.

**1. Scrap Metal**

As to the metal turnings or scrapings, PTM admits to having produced this form of scrap metal. More particularly, PTM stated in response to an interrogatory that the scrap metal provided by PTM to Rosen Brothers could have contained cast iron, malleable iron, carbon steel, types 304 and 316 stainless steel, aluminum, inconel, menel, hastelloy, brass, copper, copper-nickel, chromel, alumel, nickel-chromium, and nickel-aluminum.

The plaintiff claims that the deposition testimony of ex-Rosen employees, Linda McCloy, Derl Ross, Elbert Soule, and Michael Scott establishes that such scrap metal was transported by Rosen from PTM to the Rosen site during at least the time period 1971–1974. In particular, McCloy states that PTM was a customer of Rosen Brothers when she worked there, that Rosen Brothers handled the scrap metal turnings, which were "greasy wet," and that they dumped them at the Rosen Site. It was Ms. McCloy who received the calls from PTM when a pick up was needed, and it was she who dispatched an employee to drive a truck to PTM to pick up the scrap turnings. As to Ross, he testified at his deposition that he would go to PTM once a week, pick up the "turning box" that contained scrap metal and cutting oil, take it to the Rosen site, and dump the contents onto the ground. Mr. Soule testified at his deposition that he recalled picking up a box of oily metal turnings about once a month from PTM and dumping the contents on the ground at the Rosen Site. Finally, as to Mr. Scott, he testified that PTM steel and aluminum turnings covered with cutting oil were taken in boxes to the Rosen Site, and

---

**1.** Any substance listed in the following: Clean Water Act, CERCLA § 9602, § 3001 of the Solid Waste Disposal Act, § 307(A) of the Clean Water Act, § 112 of the Clean Air Act, and any imminently hazardous chemical substance or mixture with respect to which the EPA has taken action.

dumped. Each testified that they had personal knowledge of the contents of the boxes being picked up and/or dumped.

■ The defendant's attacks on the testimony of these deponents as statements based on hearsay or lacking personal knowledge. However, this simply is not an accurate assessment of the testimony of the witnesses, and is of no moment. Summary judgment in favor of the plaintiffs is appropriate on CERCLA liability for the dumping of metal turnings or scrapings.

■ As to the carbon steel separator sheets, the defendant PTM does not oppose the argument of the plaintiffs that such scrap was sold by PTM to Polson Metal Recovery, Inc., resold to Rosen Brothers, and subsequently dumped at the Rosen Site. Carbon steel is a CERCLA hazardous substance. Summary judgment in favor of the plaintiffs is appropriate on the issue of CERCLA liability as to the dumping of carbon steel separator sheets.

■ As to the steel and copper wire scrap, PTM admits that it generated such scrap. The plaintiffs rely on the testimony of an ex-Rosen Brothers employee for its assertion that such scrap was dumped at the Rosen Site. The employee, Mr. [H]ollenbeck, testified that he personally viewed metal and copper wire in a "box" at PTM. In addition, he picked up and dumped the "box" at the Rosen site. The defendant states that Mr. Hollenbeck testified that after being dumped at the Rosen Site, the scrap was then separated and taken away. In fact, Mr. Hollenbeck stated only that he assumed that that is what occurred. However, the testimony of Phillip Rosen, indicates that no copper wire ever went to the Rosen site. Rather, it all went to the Cobb Building (off site) and later to another location. Given two diametrically opposed versions of events with respect to the wire scrap, both based on personal knowledge, the Court cannot grant summary judgment on CERCLA liability for the dumping of wire scrap.

**2.** It is undisputed that the solvents and cutting oils contain a number of CERCLA hazardous

### 2. Liquid Waste

■ It is not contested that PTM produced waste solvents and cutting oils, and that such liquid waste was stored in 55–gallon drums at PTM. The plaintiff, relying solely on the deposition testimony of an ex–Rosen employee, Glenn Mattoon, claims that at least 200 of these drums were transported to the Rosen Site and buried/crushed, causing an undetermined amount of the solvents and oils inside [2] to spill out and seep into the ground. On the basis of the Mattoon deposition testimony, based on the personal knowledge of Mr. Mattoon, the plaintiffs have met their burden as to summary judgment in relation to liability.

The defendant attempts to meet its burden in two ways. First, the defendant attempts to discredit Mr. Mattoon as a witness, and second, the defendant claims that those whom Mr. Mattoon claims were with him on the day that the barrels were dumped contradict his testimony.

As to the first basis, PTM recounts an alleged forgery conviction from decades ago, repeats charges of theft, and makes allegations of Mr. Mattoon's "pathetic reputation for dishonesty" in the community. PTM asserts that this is proper, and cites *U.S. v. McMurray*, 20 F.3d 831, 834 (8th Cir.1994). *McMurray*, however, discusses the impeachment of a witness at trial. *McMurray* does not address the issue of impeachment at the summary judgment stage, and thus, provides little authority for the vitriolic assaults on Mr. Mattoon's character contained in the papers filed in connection with this motion. Nevertheless, summary judgment *should* be denied in this case if PTM has set forth specific facts that place the credibility of Mr. Mattoon at issue. *See County of Orange v. Sullivan Highway Products, Inc.*, 752 F.Supp. 643, 647 (S.D.N.Y.1990); *Vantage Point, Inc. v. Parker Bros., Inc.*, 529 F.Supp. 1204, 1214 (E.D.N.Y.1981), *aff'd mem.*, 697 F.2d 301 (2d Cir.1982). The specific allegations challenging Mr. Mattoon's credibility are as follows: he is a convicted forger, he is/was a suspect in other crimes, he lied

substances.

under oath, and the defendant's expert refutes allegations of a large dumping of liquid waste at the Rosen Site. The Court will address each of these allegations *seriatim.*

Mr. Mattoon's conviction for forgery, although bearing on credibility, occurred in or around 1958. It is clearly inadmissible. *See* Fed.R.Evid. 609(b). Not only is this prior conviction nearly 40 years old, but, it is of limited probative value in relation to its prejudicial effect. *Id.* The fact that Mr. Mattoon committed a forgery nearly forty years ago does not raise an issue of fact as to whether he is to be believed today.

The fact that Mr. Mattoon was a suspect in prior crimes is of no moment to the Court at this stage. Allegations of wrongdoing are not facts that bear on Mr. Mattoon's credibility. *See Sterling Nat. Bank & Trust Co. v. Federated Dept. Stores,* 612 F.Supp. 144, 146 (S.D.N.Y.1985). Thus, they will not serve to raise a material factual issue.

PTM alleges that Mr. Mattoon lied under oath. Specifically, the defendant alleges that Mr. Mattoon lied about his involvement in an alcohol related automobile accident in April 1994, about past military service, and about certain civil judgments filed against him. A review of the deposition of Mr. Mattoon belies the defendant's desperate attempts to paint Mr. Mattoon as a liar. At best, Mr. Mattoon failed to answer questions directly that in his view, and that of the Court, strayed well beyond matters bearing on this case. As an example, the Court reproduces the following colloquy from Mr. Mattoon's deposition:

**Q.** Were you in the service?

**A.** If you say so.

**Q.** I don't know. I mean were you in the service?

**A.** I don't know. You seem to know about my personal life. You've had investigators down checking with my son, all my friends.

**Q.** I believe Mr. Owens was checking with your son as well.

**A.** Yeah, but he didn't degrade me like you people were [sic].

**Q.** I certainly don't mean to degrade you.

**A.** I don't care whether it's your intention. No more personal life.

**Q.** I certainly don't mean to degrade you, Mr.—

**A.** You're doing it.

**Q.** It's not my intention.

**A.** That's what you're doing.

**Q.** I apologize if that's the way you're taking it.

**A.** You don't need to dig up my personal life like you have.

**Q.** I just want to know if you were in the service.

**A.** Could be. Now back off.

**Q.** I don't mean to be—

**A.** Back off.

**Q.** Mr. Mattoon, I really apologize, but I have a right to ask my questions.

**A.** You ain't got a right to dig up my personal life. This is Rosen, not me, and you're bringing stuff in here that doesn't need to be here. Let's do Rosen and get done with so I can get back on a normal life. You guys been harassing me for the last three months, your investigators, and harassing my family, harassing my friends, and I know it wasn't him the last couple weeks.

**Q.** Were you in the service?

**A.** Fifth Amendment.

Plaintiffs' Exhibit G(13) at 187–189).

Mr. Mattoon failed to directly answer the question of whether he was in the service. Moreover, it is clear that he was agitated and completely unwilling to cooperate on that line of inquiry. However, to state that Mr. Mattoon lied while under oath is an overstatement. As to the alleged lies under oath relating to civil judgments, Mr. Mattoon simply stated that he had not received any, and objected to the questioning. In essence, Mr. Mattoon stated that he had no knowledge of any civil judgments filed against him. To state that Mr. Mattoon lied is, again, an overstatement of his testimony. Accordingly, the Court will not deny the plaintiffs' motion for summary judgment as to liability with respect to the alleged dumping of liquid waste on the basis that Mr. Mattoon lied under oath.

Finally, as to witness credibility, the defendant argues that Mr. Mattoon must be found incredible by the Court on the basis that the defendant's expert, James Smith, refutes his testimony. More specifically, the defendant's expert states that based on his reading of Mr. Mattoon's testimony, approximately 11,000 gallons of used solvents and oils were released at the Rosen Site. In addition, upon analysis of trichloroethane samples taken from locations nearest to the spot indicated by Mr. Mattoon as the spill site, James Smith concluded that there is no evidence to support a claim that 11,000 gallons of solvents and oils were spilled.

The plaintiffs argue that the defendant's expert wrongly assumes that the maximum amount of solvent spilled. In fact, Mr. Mattoon stated that approximately 25 of the barrels were not full. Moreover, Mr. Mattoon did not testify that all the barrels leaked or were broken open. Thus, according to the plaintiffs the assumptions upon which the defendant's expert based his opinions were invalid. In addition, the plaintiffs' expert, Roy Ball, stated that trichloroethane was, in fact, found at the location of the dumping of the 200 barrels. Moreover, acetone, toluene, chromium, zinc, perchloroethylene, trichloroethylene, benzene, xylene, ethylbenzene, and chloride were found at the same location. Each is a CERCLA hazardous substance, and each is a constituent of the solvents and/or oils used by the defendant. The defendant's expert does not refute these facts. Accordingly, the testimony of the defendant's expert does not establish that Mr. Mattoon's version of events relating to the dumping of liquid waste cannot be believed.

The Court now turns to the second basis on which the defendant attempts to rebut the assertions of Mr. Mattoon; contradictory testimony of those allegedly present with Mr. Mattoon on the day that the dumping occurred. Mr. Mattoon testified that when he delivered the 200 barrels to the Rosen Site he was assisted there by Michael Scott and George Berg. The defendant argues that Berg never mentions liquid waste, Scott denied knowledge that PTM ever provided liquids to Rosen, and Phillip Rosen stated that Mr. Mattoon never took liquids from PTM.

As to Berg, who is now deceased, the fact that he never mentions liquids is not a fact that raises a material factual issue on the issue of liability for liquid waste dumping. The Berg affidavit is fairly general. In his affidavit, Berg expressly mentions drums only in connection with Brockway and drums of paint. Defendant's Exhibit 4 at 1. However, he also states that Rosen had two sites for draining drums, called acid ponds, which were filled with cement. *Id.* at 2–3. There is no further elaboration with regard to sources and types of liquid waste dumped at the Rosen Site in those acid ponds. Moreover, there is no specific denial of Mr. Mattoon's testimony. Thus, there is no factual support for a claim that PTM liquid waste was not dumped at the Rosen Site. In other words, there are no facts in the Berg Affidavit to contradict the Mattoon claims.

The testimony of Michael Scott that the defendant suggests supports summary judgment in its favor in regard to liquid waste is not contradictory of Mattoon. Scott states, in response to a question of whether he ever saw oils or solvents on PTM turnings, that he couldn't be sure because he couldn't be sure which turnings came from which business providing waste to Rosen. Contrary to PTM's assertion, this is not a statement that Scott had no knowledge that PTM provided liquids to Rosen. The testimony concerned turnings, their general appearance, and whether any liquid was on the turnings. The deponent was not asked about drums of liquid waste. The defendant has mischaracterized Scott's deposition testimony.

The testimony of Phillip Rosen that the defendant suggests supports summary judgment in its favor in regard to liquid waste is not contradictory of Mattoon. The only testimony given by Mr. Rosen in relation to PTM liquid waste of any kind was that he didn't think he understood the question that he was asked at his deposition. The question was not rephrased, and Mr. Rosen gave no further testimony in relation to PTM liquid waste or its disposal. This cannot be said to be factual support for the defendant's position.

For the foregoing reasons, the Court grants the plaintiffs' motion for summary

judgment on the issue of liability against PTM as to liquid waste solvents and cutting oils.

To recapitulate, the Court grants the plaintiffs' motion for summary judgment, in part, on the issue of liability for the dumping of scrap metal turnings, carbon steel separator sheets, and liquid waste solvents and cutting oils, and further, the Court denies the plaintiffs' motion for summary judgment, in part, on the issue of liability for the alleged dumping of steel and copper wire scrap.

### E. Divisibility

■ Having established liability against PTM, the defendant may now avoid joint and several liability for the entire cost of remediation at the Rosen Site only if it can show that its scrap metal turnings, carbon steel separator sheets, and liquid waste "did not contribute to the release and the clean-up costs that followed, or contributed at most to only a divisible portion of the harm." *Alcan*, 990 F.2d at 722 (citation omitted). To defeat PTM's motion for summary judgment on the issue of divisibility, the plaintiffs "need only show that there are genuine issues of material fact regarding a reasonable basis for apportionment of liability." *Id.* As explained in *Alcan*, the concept of causation is being reintroduced to the CERCLA context when a Court analyzes divisibility. However, this "special exception to the usual absence of a causation requirement, . . . is applicable only to claims . . . where background levels are not exceeded." *Id.* Thus, the defendant must first establish that the hazardous substances that caused the plaintiffs to incur response costs did not exceed background levels. *Id.* If the defendant can make such a showing, it must then establish that there is a basis for divisibility of harm. *Id.* It is important to note that as a strict liability statute, if the defendant fails to prevail on the divisibility argument as to any particular CERCLA hazardous substance, it is jointly and severally liable for the entire response cost. *See U.S. v. Alcan Aluminum (Alcan–Butler)*, 964 F.2d 252, 266 (3d Cir.1992).

In *Alcan*, the Court denied summary judgment on the issue of divisibility based on a dispute between each sides' experts as to the effect of the dumping of Alcan's waste emulsion. 990 F.2d at 722–23. This Court also finds that there are questions of fact that preclude summary judgment on the issue of divisibility.

First, this Court has granted summary judgment on the issue of liability as to scrap metal turnings, carbon steel separator sheets, and liquid waste. The defendant has assumed divisibility on scrap metal comprised of copper and manganese only. Thus, to the extent that PTM has not shown that the hazardous substances found in liquid waste and carbon steel contribute less than background levels at the Rosen Site, a ruling in favor of PTM is inappropriate.

Second, as to scrap metal itself, the defendant assumes that it is responsible for the time of its direct dealing with Rosen Brothers in the early 1970s. According to the defendant this time period is roughly 6 months. It is on the basis of the amount of scrap metal dumped in that discrete time period that the defendant's expert reaches his conclusions. However, the plaintiffs' expert bases his conclusions on an additional 700,000 pounds of scrap metal allegedly disposed of at the Rosen Site. The plaintiffs argue that this additional scrap came from PTM by way of Polsen's Metal Recovery, which was owned in part by Phillip Rosen. In support, the plaintiffs point to the deposition testimony of Mike Scott and Walter Ellis. Both individuals testified that metals originating at PTM came to the Rosen Site via Polson's.

Third, the defendant's experts claims that, as to background levels of manganese, copper, nickel chromium, and cobalt, the amount of scrap metal, excluding or including the 700,000 pounds claimed by the plaintiffs, would release only infinitesimal amounts into the environment.[3] The plaintiffs claim that the Remedial Investigation Report indicates that certain CERCLA hazardous substances

---

3. The Court notes that "[t]he absence of threshold quantity requirements in CERCLA leads logically to the conclusion that the Act's 'hazardous substance' definition includes even minimal amounts." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 517 (2d Cir.1996).

found in the defendant's scrap metal waste and liquid waste exceed background levels. Moreover, the plaintiffs argue that the sampling performed by the defendant's expert, James Smith, was compared to background levels for a far wider geographical area than the area more closely surrounding the Rosen Site. When compared with the closer surrounding area, the plaintiffs claim that the numerous CERCLA hazardous substances contained in the waste generated by PTM and dumped at the Rosen Site exceed background levels.

Finally, the defendant argues that certain CERCLA hazardous substances will not be released into the environment, or may be released into the environment in such small amounts as to merit relieving PTM from liability as to the response costs incurred at the Rosen Site. However, as stated by the Second Circuit, "proof that a defendant's waste did not release listed hazardous substances is only relevant to the issue of apportionment of damages, not to the issue of liability." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 516 (2d Cir.1996) (citation omitted). Moreover, "a defendant who disposes of hazardous substances that are not independently releasable may still be held liable, even though that defendant may not be required to pay damages when the cost apportionment phase of the litigation is reached." *Id.* In addition, the plaintiffs' expert disputes that the CERCLA hazardous substances contained in the defendant's scrap metal has not or will not be released into the environment.

On the basis of the foregoing, the Court cannot grant summary judgment on the issue of divisibility in the defendant's favor. "These differing contentions supported by expert affidavits raise sufficient questions of fact to preclude the granting of summary judgment on the divisibility issue." *See Alcan, supra* at 722.

### F. Apportionment

The defendant PTM would have this Court address its apportionment arguments at this time. This the Court declines to do.

 "[W]here a defendant seeks to apportion damages according to its own contribution to the harm, it is the defendant's burden to establish that the damages are capable of such apportionment." *Town of New Windsor v. Tesa Tuck, Inc.*, 935 F.Supp. 315, 317 (S.D.N.Y.1996), *citing Alcan–Butler, supra* at 269. For the same reasons that lead to the Court denying the defendant's motion for relief under a divisibility theory, the Court also declines to decide the apportionment issue at this time. In addition, the defendant has failed to provided the Court with total amounts of scrap metal or liquid waste dumped at the Rosen Site. Without such information, and the constituent components of those substances, the Court cannot reasonably apportion liability for response costs.

### III. CONCLUSION

For the reasons stated herein, the Court hereby DENIES the defendant PTM's motion to dismiss the plaintiffs' Complaint for failure to state a claim, on the basis that CERCLA cannot be applied retroactively, and on the basis that CERCLA as applied against PTM violates the Commerce Clause of the United States Constitution, and further GRANTS the plaintiffs' motion for summary judgment, in part, on the issue of liability for the dumping of scrap metal turnings, carbon steel separator sheets, and liquid waste solvents and cutting oils, and further, DENIES the plaintiffs' motion for summary judgment, in part, on the issue of liability for the alleged dumping of steel and copper wire scrap, and further DENIES the defendant's cross-motion for summary judgment in its entirety.

**IT IS SO ORDERED.**