**SENECA MEADOWS, INC., et al., Plaintiffs,**

v.

**ECI LIQUIDATING, INC., Defendants.**

No. 95–CV–6400L.

United States District Court, W.D. New York.

Oct. 26, 2000.

Terry M. Richman, Underberg & Kessler, Rochester, NY, Ronald G. Hull, Underberg & Kessler, Rochester, NY, for plaintiffs.

Robert E. Glanville, Kevin M. Hogan, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY, for ECI Liquidating, Inc., Evans Chemetics, Inc., Evans Research and Development Corp., W.R. Grace and Co., Inc., W.R. Grace and Co.—Conn., Inc., defendants.

R. William Stephens, Raichle, Banning, Weiss & Stephens, Buffalo, NY, Craig A. Slater, Harter, Secrest and Emery LLP, Buffalo, NY, Angela M. Demerle, Harter, Secrest & Emery, LLP, Buffalo, NY, for Fisher Body Division of General Motors Corp., Fisher Guide Division of General Motors Corp., General Motors Corporation, Hampshire Chemical Corp., defendants.

Craig A. Slater, Harter, Secrest and Emery LLP, Buffalo, NY, Angela M. Demerle, Harter, Secrest & Emery, LLP, Buffalo, NY, for GTE Corporation, GTE Products Corp., GTE Sylvania, Inc., General Telephone and Elec. Corp., North American Philips Corporation, Osram Sylvania, Inc., Sylvania Electric Products, Inc., defendants.

Philip H. Gitlen, Michael G. Sterthous, Molly M.A. Brown, Whiteman, Osterman & Hanna, Albany, NY, for Gould Pumps, Inc., Gould Pumps (N.Y.) Inc., defendants.

Angela M. Demerle, Harter, Secrest & Emery, LLP, Buffalo, NY, for Philips Electronics North America Corporation, defendant.

Richard A. Palumbo, Boylan, Brown, Code, Fowler & Wilson, Rochester, NY, for Sales Affiliates, Inc., defendant.

R. William Stephens, Raichle, Banning, Weiss & Stephens, Buffalo, NY, for Fisher Body Division of General Motors Corp., Fisher Guide Division of General Motors Corp., General Motors Corporation, counter-claimants.

Terry M. Richman, Underberg & Kessler, Rochester, NY, for Seneca Meadows, Inc., Macedon Homes, Inc., counter-defendant.

Robert E. Glanville, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY, for Evans Chemetics, Inc., Evans Chemetics Division of Hampshire Chemical Corp., Evans Chemetics Division of W.R. Grace & Co., Inc., Hampshire Chemical Corp., W.R. Grace and Co., Inc., W.R. Grace and Co.—Conn., Inc., counter-claimants.

Robert E. Glanville, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY, for Evans Chemetics, Inc., Evans Chemetics Division of Hampshire Chemical Corp., Evans Chemetics Division of W.R. Grace & Co., Inc., cross-claimant.

Richard A. Palumbo, Boylan, Brown, Code, Fowler, Vigdor & Wilson, LLP, Rochester, NY, for Zotos International, Inc., third-party defendant.

*DECISION AND ORDER*

LARIMER, Chief Judge.

## INTRODUCTION

Plaintiffs Seneca Meadows, Inc. ("SMI") and Macedon Homes, Inc. ("MHI") com-

menced this action in August 1995, asserting various causes of action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Plaintiffs allege that the twenty-four named defendants were responsible for contamination at a landfill ("the Tantalo Site") owned by SMI, and on certain property adjacent to the landfill ("the Adjacent Properties"), owned by both SMI and MHI. The original complaint, and the first amended complaint, which plaintiffs filed as of right in September 1995, asserted causes of action under both CERCLA and New York State common law.

Pursuant to two Decisions and Orders previously entered by this court, *see* 983 F.Supp. 360 (W.D.N.Y.1997), and 16 F.Supp.2d 255 (W.D.N.Y.1998), familiarity with which is assumed, many of plaintiffs' original causes of action have been dismissed. The 1997 Decision and Order dismissed SMI's common law claims regarding the Tantalo Site as time-barred. The 1998 Decision and Order dismissed SMI's claim under CERCLA § 107, 42 U.S.C. § 9607.

Plaintiffs filed a second amended complaint on April 28, 2000. It asserts claims under CERCLA §§ 112 and 113, and a claim for a declaratory judgment declaring that defendants are liable for future response costs incurred by SMI in connection with the contamination at the Tantalo site. In addition, although the second amended complaint does not contain a § 107 claim, it does appear to reassert some of the previously dismissed common law claims. The fourth through twelfth claims are all based on New York common law, and assert claims on behalf of both plaintiff with respect both to the Tantalo Site and the Adjacent Properties. Since SMI's common law claims relating to the Tantalo Site have already been dismissed, I will deem these claims only as asserting claims relating to the Adjacent Properties.

Currently pending before the court are two motions for summary judgment. One was filed by nine defendants, all of which are companies related in some way to GTE Corporation ("the GTE defendants" or "GTE"). The other was filed by defendant General Motors Corporation ("GMC"). By order entered September 29, 2000, the Court denied both motions for summary judgment in their entirety. On further reflection, it appears that GMC's motion should be granted in part, but, in all other respects, GMC's motion and GTE's motion for summary judgment are denied and this decision sets forth the bases for that denial.

## DISCUSSION

### I. CERCLA Liability and Defenses: General Standards

The relevant legal principles relating to CERCLA actions were set forth in two leading cases, *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993), and *Acushnet v. Mohasco Corp.*, 191 F.3d 69 (1st Cir.1999). In *Alcan*, which was a cost recovery action brought by the Government under CERCLA § 107, the Court of Appeals for the Second Circuit explicated a number of precepts concerning CERCLA liability. First, the court explained that CERCLA imposes strict liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment" of hazardous substances "from which there is a release, or a threatened release which causes the incurrence of response costs." *Id.* at 721 (quoting 42 U.S.C. §§ 9607(a)(3) and (4)). In order to prevail, then, the court stated that the Government had to prove that: "(1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) that the defendant generated hazardous waste at the clean-up site. What is not required is that the government show that a specific defendant's waste caused incurrence of clean-up costs." *Id.*

The court then went on to state that in order to avoid the "harsh result" of mak-

ing CERCLA liability limitless, *id.,* "courts have added a common law gloss onto the statutory framework. They have at once adopted a scheme of joint and several liability but at the same time have limited somewhat the availability of such liability against multiple defendants charged with adding hazardous substances to a Superfund site." *Id.* at 721–22. Based on common law principles relating to joint tortfeasors, the court stated, a CERCLA defendant "may escape any liability for response costs if it either succeeds in proving that its [wastes], when mixed with other hazardous wastes, did not contribute to the release and the clean-up costs that followed, or contributed at most to only a divisible portion of the harm." *Id.* at 722. The defendant, however, "bears the ultimate burden of establishing a reasonable basis for apportioning liability." *Id.*

In so ruling, the court "candidly admit[ted] that causation is being brought back into the case—through the backdoor, after being denied entry at the frontdoor— at the apportionment stage." *Id.* The court added, however, that

> causation—with the burden on defendant—is reintroduced only to permit a defendant to escape payment where its pollutants did not contribute more than background contamination and also cannot concentrate. To state this standard in other words, we adopt a special exception to the usual absence of a causation requirement, but the exception is applicable only to claims, like Alcan's, where background levels are not exceeded. And, we recognize this limited exception only in the absence of any EPA thresholds.

*Id.*

The court then went on to discuss the timing of the divisibility issue. After reviewing CERCLA's language and legislative history, the court concluded that in general, "liability is fixed first and immediately for enforcement purposes; litigation later to sort out what contribution is owed

and by whom as a result of the remediation effort." *Id.* at 723. But, the court added, it did "not rule that this chronology be followed or that the … approach of deciding divisibility at the initial liability phase of the case is the best way for the district court to proceed. Instead, the choice as to when to address divisibility and apportionment are questions best left to the sound discretion of the trial court in the handling of an individual case." *Id.*

The first Circuit followed these principles in *Acushnet,* in which the court affirmed an order dismissing the claims against certain defendants before a full trial on apportionment, on the ground that those defendants had not caused the plaintiff to incur response costs. In reaching that conclusion, the court stated that

> a defendant may avoid joint and several liability for response costs in a contribution action under § 9613(f) if it demonstrates that its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts. This rule is not based on CERCLA's causation requirement, but is logically derived from § 9613(f)'s express authorization that a court take equity into account when fixing each defendant's fair share of response costs. We caution, however, that not every *de minimis* polluter will elude liability in this way. As always, an equitable determination must be justified by the record.

*Acushnet Co. v. Mohasco Corp.,* 191 F.3d 69, 77–78 (1st Cir.1999). The court also noted that "the standard for contribution liability [under § 9613] is the same as that under § 9607(a), but in resolving contribution claims, a court may, in its discretion, 'allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'" *Id.* at 75 (quoting 42 U.S.C. § 9613(f)(1)) (citation omitted).

## II. Motions in the Case at Bar

### A. GTE Defendants' Motion for Summary Judgment

The GTE defendants have moved for summary judgment on the ground that the only wastes that they sent to the Tantalo Site were non-hazardous, and that they therefore did not contribute to the necessity for remediation. Plaintiffs contend that there are issues of fact in that regard, and that the GTE defendants' motion is premature because discovery is not complete.

In support of their motion, the GTE defendants have submitted two expert reports by Dr. John Tewhey, who holds a Ph.D. in geochemistry and is the president of Tewhey Associates, an environmental consulting firm. In his first report, Dr. Tewhey identifies five categories of waste that may have been disposed of by the GTE defendants at the Tantalo site. He opines, however, that none of those materials could have triggered remedial action based on the presence of tricloroethene ("TCE") and its breakdown products in groundwater, which defendants contend are the contaminants that "drive" the remedial action ordered by the New York State Department of Environmental Conservation ("DEC"). In short, Dr. Tewhey states that most of the materials that were disposed of at the site by GTE never contained or were exposed to TCE. Dr. Tewhey states that these materials (mostly general trash and television picture tubes) may have contained some other chemicals, such as phosphor, graphite and lead, but according to defendants, those compounds have not generated any response costs.

Dr. Tewhey also states that some gloves and rags that may have been disposed of at the Tantalo site may have come into contact with TCE at some point, but he contends that the TCE would have rapidly evaporated. He asserts that these items would therefore have been "virtually TCE-free" by the time they were sent to the landfill. Expert Report of Dr. John D. Tewhey, dated Feb. 4, 2000, at 7.

Dr. Tewhey further opines that the actual source of some, if not all, of the TCE and related compounds present at the Tantalo site was solid wastes generated and disposed of by defendant Evans Chemetics, Inc. ("ECI"). Dr. Tewhey states that ECI disposed of its wastes at another site, which it owned, from 1951 to 1958, and that that site was later discovered to be contaminated with TCE. He adds that no one other than ECI disposed of wastes at that site, so ECI's wastes must have been the source of the TCE there. ECI allegedly disposed of its wastes at the Tantalo site from 1959 to 1974, so, according to Dr. Tewhey, those wastes are the likely source of the TCE in the groundwater at the Tantalo site.

In response, plaintiffs have submitted two expert reports by Dr. Kirk W. Brown, who holds a Ph.D. in agronomy and is a Professor of Soil and Crop Sciences at Texas A & M University. Dr. Brown sets forth a number of hazardous substances that would have been generated as a result of GTE's production of cathode ray tubes, including TCE and other chemicals. He states that various types of items would have become contaminated with TCE during that process, such as floor sweepings, rubber gloves, clothing and rags. He disputes Dr. Tewhey's assertion that the TCE would have almost completely evaporated by the time these items were disposed of. He also states that during degreasing of metal parts, a sludge eventually results in the bottom of the containers in which the degreasing is performed, and that because degreasing was accomplished by dipping the metal objects in TCE, this sludge also contained TCE. Plaintiffs allege that this sludge was not disposed of on-site, but was sent to the Tantalo landfill along with GTE's other wastes.

In addition, plaintiffs dispute defendants' contention that it is only TCE that is driving the remediation process. Dr. Brown states that several other hazardous substances have been identified at the Tantalo site, and that many of those sub-

stances would have been generated by the GTE defendants. These substances include heavy metals, lead, phosphor, cadmium, zinc, copper, and aluminum. He states that many of these same chemicals were listed in reports prepared in conjunction with the remediation effort, and that the concentration of some of these chemicals was found to exceed federal and state drinking water and groundwater standards. For example, a "Focused Feasibility Study" prepared by Eckenfelder Engineering P.C. shows levels of, *inter alia,* cadmium, lead and iron—all of which Dr. Brown opines were associated with GTE's production of cathode ray tubes—that were in excess of state and federal standards. *See* Affidavit of Paul F. Keneally, Esq. (Docket Item 151) D, Table 3–1. Moreover, the GTE defendants have not pointed to anywhere in the record where the DEC expressly stated that TCE and its related compounds were the *only* contaminants "driving" the remediation effort. The DEC stated that TCE and other chlorinated solvents, as well as metal manganese, were "the *primary* contaminants of concern," Keneally Aff.Ex. B at 13, but did not foreclose the possibility that other hazardous substances at the site might be a problem as well.

GTE's motion is opposed not only by plaintiffs, but by defendants W.R. Grace & Co. and W.R. Grace & Co.—Conn. (collectively "Grace"), who purchased ECI's assets in 1978. Grace denies that ECI's wastes were the source of the TCE at the Tantalo site, and contends that the evidence shows beyond dispute that GTE arranged to have hazardous wastes disposed of there. Grace also states that there has not yet been any expert discovery, and that Grace should have the opportunity to depose Dr. Tewhey. Grace contends that Dr. Tewhey's conclusion that ECI was the source of the contamination rests on factually incorrect assumptions about the nature and source of certain wastes at the site. Grace also cites certain documents obtained during discovery that allegedly show that GTE generated substantial waste containing various contaminants that was disposed of at the Tantalo site over the years.

Both plaintiffs and Grace also contend that further discovery is needed. Under the Case Management Order governing this action, all issues other than "general liability" were deferred until "Phase 3," which has not yet begun. Phase 3 discovery will include, *inter alia,* discovery pertaining to plaintiffs' investigation and remediation of the landfill. Not until that discovery is complete, they maintain, will the court be in a position to determine whether the GTE defendants, Grace, or any other defendants contributed at most only to a divisible portion of the harm.

■ After reviewing the record, I find that there do exist genuine issues of material fact that preclude summary judgment. It is simply not possible at this point to find as a matter of law that the GTE defendants' wastes disposed of at the Tantalo site did not contribute to any response costs.

Most notable in this regard are the conflicting opinions of the parties' experts. While I recognize that a party cannot defeat a well-founded motion for summary judgment simply by submitting a contradictory expert's "naked opinions," *see Weigel v. Target Stores,* 122 F.3d 461, 469 (7th Cir.1997), more than that is presented here. Dr. Brown has not simply asserted the bare conclusion that the GTE defendants contributed to the contamination at the Tantalo site; rather, he has relied upon evidence in the record to support that conclusion. He has, for instance, cited evidence (which is not disputed by GTE) that TCE was used in degreasing operations at GTE's plant in Seneca Falls, New York. He has also cited evidence that in the course of these operations, various objects would have come into contact with TCE, such as clothing, floor sweepings, rags, etc. There is also no dispute here that some of those *types* of objects were disposed of at the Tantalo site. The GTE

defendants may deny that those objects were contaminated with TCE, but on the record before me, I cannot resolve that issue on a motion for summary judgment. *See Alcan,* 990 F.2d at 722–23 ("These differing contentions supported by expert affidavits raise sufficient questions of fact to preclude the granting of summary judgment on the divisibility issue"); *Wilson v. Amoco Corp.,* 33 F.Supp.2d 981, 985 (D.Wyo.1998) (while plaintiffs' evidence, including expert's affidavit, regarding contamination of their properties was "not compelling," it was not "so flimsy as to warrant summary judgment" for defendant); *Darbouze v. Chevron Corp.,* No. CIV. A. 97–2970, 1998 WL 512941 *6 (E.D.Pa.1998) ("Further, there is conflicting expert opinion on whether barium, cadmium, and chromium are normally found in petroleum products and if so whether the concentrations of those metals in Tank # 2 exceed normal levels. Thus, Summary Judgment cannot be granted as to the 'hazardous substance' element of Darbouze's CERCLA claim for Tank # 2"); *Federal Ins. Co. v. Purex Indus., Inc.,* 972 F.Supp. 872, 888 (D.N.J.1997) (finding genuine dispute of expert opinions that precluded summary judgment on claims brought under Environmental Cleanup Responsibility Act); *Cooper Indus., Inc. v. Agway, Inc.,* 956 F.Supp. 240, 248–49 (N.D.N.Y.1997) (denying motion for summary judgment on issue of divisibility in CERCLA action, in part because of conflicting expert testimony); *Textron Inc. v. Barber–Colman Co.,* 903 F.Supp. 1570,

1579 (W.D.N.C.1995) (stating that where parties' experts disagreed as to how certain contaminant would have been produced, "the Court cannot choose between these opinions at this point in the proceedings," i.e., defendant's motion for summary judgment); *Orange Environment, Inc. v. County of Orange,* 860 F.Supp. 1003, 1029 (S.D.N.Y.1994) ("we are uncomfortable granting summary judgment at this juncture in light of the disputes between the various experts as to the effect of the landfill on the health and environment"); *United States v. Port Chester Housing Auth.,* No. 88 Civ. 0027, 1991 WL 206301 *1 (S.D.N.Y. Oct. 3, 1991) ("the conflicts in the highly technical expert testimony ... require a denial of summary judgment"); *Norfolk Southern Corp. v. Oberly,* 632 F.Supp. 1225, 1243 (D.Del.1986) ("On summary judgment it is not the Court's function to untangle the affidavits and decide which experts are more correct"), *aff'd,* 822 F.2d 388 (3d Cir.1987).[1]

I also note that in addition to Dr. Brown's reports, plaintiffs have submitted a form that the GTE defendants submitted to the DEC in 1984, which states in part that GTE deposited wastes at the Tantalo site from 1952 through 1981. The form states that these wastes consisted of a "[c]omplex matrix of general plant trash unsegregated for definitive waste type concentration [p]rior to about 2/78. Segregated waste streams since 2/78 are referenced in items below." Keneally Aff.Ex. B at 8.

---

1. In response to a question from the court at oral argument concerning whether counsel for the GTE defendants was aware of any case of this type in which a court, when faced with conflicting expert affidavits, had accepted the opinion of one expert over the other, counsel cited *Freeport–McMoran Resource Partners v. B–B Paint Corp.,* 56 F.Supp.2d 823 (E.D.Mich.1999). That case is distinguishable from the one at bar, however. In *Freeport–McMoran,* the court found that the plaintiff's proffered expert testimony did not comply with the standards for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), primarily because the

plaintiff had not demonstrated that the proposed expert's methodology enjoyed general acceptance within a relevant scientific community. *Freeport–McMoran,* 56 F.Supp.2d at 833. In the instant case, the GTE defendants' criticism of Dr. Brown's opinions stems not from his methodology, but from alleged factual errors underlying his analysis. In that circumstance, however, I believe that *Daubert* teaches that "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

Those segregated wastes, which were stated to have been sent to other sites, included "mixed chlorinated solvents," including "Trichloroethylene, ... Tri-chlorethane, [and] Perchloroethylene." *Id.* at 11. The quantity of wastes disposed of at the Tantalo site was estimated at 3780 tons per year. *Id.* at 8. That is some evidence, then, that prior to February 1978, the unsegregated wastes sent to the Tantalo site could have contained chlorinated solvents, including TCE and related compounds. Given the large amount of waste sent to the Tantalo site by GTE, even relatively small amounts of TCE in each load of waste could also have added up significantly over time. Furthermore, at least according to Dr. Brown (though defendants do not appear to dispute this), TCE and its related compounds are man-made chemicals that are not naturally occurring and hence have no natural "background" level in the environment; therefore, it would seem that *any* presence of TCE could not fall within *Alcan*'s limited exception to the absence of a causation requirement, which "is applicable only to claims ... where background levels are not exceeded." *Alcan,* 990 F.2d at 722.

The experts also disagree about whether TCE evaporates so rapidly that it would not have been present on an object (such as a glove) by the time the object was disposed of. Dr. Tewhey—who admits that some gloves and rags that had come into contact with TCE may have been disposed of at the Tantalo site—contends that the TCE would have completely evaporated first. Dr. Brown, however, opines that evaporation rates can vary depending on a number of factors, such as the vapor pressure in the surrounding air, whether the object is soiled, and whether it is compressed with other trash. *See* Expert Report of Dr. Kirk W. Brown (Docket Item 145) at 8. This, too, is a matter that is not properly resolved on a summary judgment motion.

Moreover, there is a clear dispute over whether TCE and its related compounds are truly the only chemicals "driving" the remediation, or whether other contaminants are involved as well. As explained above, Dr. Brown's report indicates that a number of contaminants were contained in GTE's wastes that were sent to the Tantalo site. GTE's insistence that these contaminants have not generated response costs notwithstanding, I am not prepared to rule as a matter of law at this stage of the case that the presence of these chemicals at the Tantalo site is irrelevant. *See Prisco v. A & D Carting Corp.,* 168 F.3d 593, 603 (2d Cir.1999) ("It is not a defense that the particular hazardous substance attributable to a specific defendant is not linked to the plaintiff's response costs"); *accord B.F. Goodrich v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998); *Alcan,* 990 F.2d at 721. It appears that the remediation process is still ongoing, and while TCE may be the principal contaminant of concern at this point, it is not necessarily the sole concern. At any rate, even if TCE were the only contaminant sought to be contained, the evidence of GTE's possible disposal of TCE and TCE-contaminated objects at the Tantalo site gives rise to genuine issues of fact that precludes summary judgment.

The fact that discovery is not complete provides an additional reason to deny the GTE defendants' motion. While there may be situations where the remaining discovery relates only to matters that have no bearing on the issues relating to a motion for summary judgment, I am not convinced that this is the case here. Phase 3 discovery relating to plaintiffs' remediation efforts, apportionment and allocation may yield information pertinent to whether the GTE defendants' disposal of wastes at the Tantalo site "contributed at most to only a divisible portion of the harm." *Alcan,* 990 F.2d at 722.

Lastly, I note that my finding that genuine issues of fact exist here regarding the GTE defendants' liability makes it unnecessary for me to address their contention

that ECI disposed of TCE at the landfill. Whether ECI did so or not is a matter that must await trial, and it has no bearing on the GTE defendants' liability, other than issues of apportionment which are not before the court at this time.

## B. GMC's Motion for Summary Judgment

Like the GTE defendants, GMC contends that it is entitled to summary judgment because it did not contribute to any response costs. Although GMC admits that it sent some wastes to SMI's property in 1974, it contends that the waste was not deposited at the Tantalo site, or at least not in the contaminated area. According to GMC, documentary evidence shows that by the time that it began sending its wastes to SMI for disposal, the Tantalo site was closed, and all wastes were being disposed of at a newer site farther to the north, across a stream known as Black Brook.

GMC further asserts that the wastes that it sent for disposal did not contain TCE or any related components. GMC also contends that its wastes formed such a minuscule amount of the total waste deposited at the landfill that under *Acushnet*, the court can find that GMC's contribution was not significant enough to warrant allocating any response costs to GMC.

GMC also states that plaintiff has no cause of action against GMC under CERCLA § 112, 42 U.S.C. § 9612. That section, according to GMC, deals with claims against the Superfund, not with claims against third parties for response costs. GMC maintains that plaintiffs' only remedy is under § 113.

As for plaintiffs' § 113 claim, GMC asserts that because plaintiffs had complete control of the wastes once they took possession of the wastes from their clients, plaintiffs should be made to pay their own cleanup costs. In addition, GMC states that SMI in the past has represented to the DEC that GMC's wastes had not caused any contamination in the affected area. Under these circumstances, GMC contends, it would be inequitable to allocate any costs at all to GMC.

Plaintiffs dispute GMC's recitation of the facts. They state that there is proof that in 1974, GMC generated tons of hazardous waste that was disposed at the Tantalo site. Plaintiffs claim that GMC is in error in asserting that the Tantalo site was closed by the time that GMC's waste was disposed of in the first six months of 1974. Plaintiffs say that the new area did not open until June 1994, so the Tantalo site could not have closed until then at the earliest.

■ Again, I find that genuine issues of material fact exist that preclude summary judgment. In particular, it is far from clear that the area south of Black Brook had closed by the time that GMC began disposing of wastes there. In addition, whether the contaminants contained in GMC's wastes have generated response costs is a matter that cannot be determined at this juncture.

Remarkably, GMC's own papers state that contemporary "correspondence is by no means clear" on the issue of when SMI began disposal activities north of Black Brook. *See* Affidavit of R. William Stephens, Esq. (Docket Item 127) ¶ 38. That is certainly true. In addition, while GMC also relies on certain reports and surveys prepared by or for SMI years after 1974, there is also evidence that the area north of Black Brook was inaccessible to vehicles until mid–1974. For instance, in a letter to the Seneca County Department of Health dated April 23, 1974, O'Brien & Gere Engineers, Inc. ("OBG"), requested permission for its client, Dominick Tantalo, to place refuse "on both the north and south sides" of Black Brook. Enclosed with the letter were drawings showing, *inter alia*, "the proposed crossing of Black Brook *to provide access to the north fill area*." Affidavit of Ronald G. Hull, Esq. (Docket Item 150) Ex. 30 (emphasis added). A memo prepared by OBG dated

April 24, 1974, indicates that Tantalo wanted "to provide an access roadway to the north fill area," and that OBG had met with the Soil Conservation Service, which was "involved" because Tantalo "want[ed] to put Black Brook through a culvert *when he crosses to the north side." Id.* Ex. 32 (emphasis added). While not necessarily conclusive, this evidence at the very least gives rise to an issue of fact concerning when the northern area first opened, and hence the earliest time when disposal operations south of Black Brook could have ceased.

In addition, though GMC asserts that its wastes contained no TCE, as with the GTE defendants, there are nevertheless issues concerning the other hazardous substances that *were* contained in its wastes. Plaintiffs have submitted evidence that GMC's wastes consisted of waste treatment sludge containing various caustic chemicals and heavy metals. Hull Aff.Exs. 36–39. Hundreds of tons of this sludge were disposed of annually. Hull Aff.Exs. 36, 38, 42. Again, I am not prepared to rule as a matter of law at this point that these hazardous wastes have in no way resulted in any response costs.

I am equally unpersuaded that as a matter of equity, GMC is entitled at this juncture to a ruling that no liability should be allocated to GMC. For one thing, issues of apportionment, which "is an intensely factual determination," *Alcan,* 990 F.2d at 722, should await the completion of Phase 3 discovery. *See also Acushnet,* 191 F.3d at 79 ("Questions of causation and appropriate equitable allocation of response costs involve quintessential issues of fact"). Although the court in *Acushnet* affirmed the district court's grant of summary judgment in favor of one defendant on the ground that the defendant's equitable share of remediation expenses would be zero, *Acushnet* 's facts are distinguishable in that discovery was fully complete in that case, and the plaintiff "gave only a non-responsive rejoinder" to the defendant's "extensive expert evidence" tending to

show that the defendant contributed only a *de minimis* amount of contamination. *Id.* at 79. The situation in the case at bar is far different, as plaintiffs have submitted evidence tending to show that GMC disposed of tons of hazardous wastes at the Tantalo site.

Nor am I persuaded by GMC's argument that plaintiffs should bear 100% of the response costs because they are financially able to do so and because the landfill generates income for them. For one thing, that again is a matter concerning equitable apportionment, and is not ripe for decision at this time. Moreover, GMC's reliance on *Prisco* is inapposite. There, the court affirmed summary judgment for the defendants because the plaintiff had failed to prove that they had transported *any* hazardous substances to the site in question. 168 F.3d at 605. The plaintiff's financial condition had nothing to do with the court's reasoning in *Prisco.* Indeed, the court recognized that " 'CERCLA is a "broad remedial statute," ' " enacted to assure 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions,' " and that as such, " 'CERCLA should be construed liberally to give effect to its purposes.' " *Id.* at 602 (quoting *Betkoski,* 99 F.3d at 514, and S.Rep. 848, 96th Cong., 2d Sess. 13 (1980), *reprinted in* 1 Senate Comm. On Env't and Pub. Works, Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, at 305, 320 (1983)). If in fact GMC disposed of hazardous wastes at the Tantalo site, I am aware of no authority that would support allocating to it zero percent of the response costs merely because the landfill was profitable for plaintiffs to operate.

I also note that GMC asserts that plaintiffs have no cause of action under New York common law for unjust enrichment, nuisance, and other theories. The basis for that contention, however, is that plaintiffs cannot establish causation. For the reasons stated with respect to plaintiffs'

**258**

claim under CERCLA § 113, I find that issues of fact exist in that regard, and that GMC's motion for summary judgment as to those claims must be denied as well.

 I do agree, however, with GMC's contention that plaintiffs' claim under CERCLA § 112 should be dismissed. By its terms, that section applies only to claims for response costs against the Superfund, not to claims against third parties. "Where a party seeking to recover response costs is itself a potentially responsible party within the meaning of § 107(a) (42 U.S.C. § 9607(a)), ... [s]uch a plaintiff is limited ... to an action for contribution from other potentially responsible parties under CERCLA § 113(f)(1) (42 U.S.C. § 9613(f)(1))." *Prisco*, 168 F.3d at 603 (citing *Bedford Affiliates v. Sills*, 156 F.3d 416, 423–25 (2d Cir.1998)). Accordingly, GMC's motion for summary judgment as to plaintiffs' claim under § 112 is granted.

### CONCLUSION

The motion for summary judgment by defendants GTE Corporation, GTE Products Corporation, GTE Sylvania Incorporated, General Telephone and Electronics Corporation, North American Philips Corporation, Osram Sylvania, Incorporated, Philips Electronics North America Corporation, Sylvania Electronic Products, Inc., and Sylvania Electrical Products, Inc. (Docket Item 130) is denied.

The motion for summary judgment by defendant General Motors Corporation (Docket Item 127) is granted in part and denied in part. The motion is granted as to plaintiffs' third claim for relief, under CERCLA § 112, and that claim is dismissed. In all other respects, the motion is denied.

The motion to dismiss the complaint, or in the alternative for summary judgment, filed by defendants Sales Affiliates, Inc. and Evans Chemetics, Inc. (Docket Item 124) is denied as moot, pursuant to the stipulation of the parties as set forth in

open court on July 18, 2000, and confirmed by letter from defense counsel to the court dated August 7, 2000.

IT IS SO ORDERED.